C. Robert SUESS, et al., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 90–981 C.

United States Court of Federal Claims.

March 17, 1995.

Don S. Wilner, Portland, OR, for plaintiffs. Thomas M. Buchanan, Washington, DC, was of counsel.

Richard E. Rice, Washington, DC with whom were Terrence S. Hartman, Asst. Director, David M. Cohen, Director, Civ. Div. and Stuart M. Gerson, Asst. Atty. Gen., U.S. Dept. of Justice, for defendant. Randy Thomas, Washington, DC, was of counsel.

SMITH, Chief Judge.

This case is currently before the court on the defendant's motion to dismiss. Plaintiffs, former shareholders in a failed savings & loan association, have alleged that the United States breached certain contractual agreements for regulatory forebearances in the operation of Benjamin Franklin Federal Savings and Loan Association of Portland, Oregon (Ben Franklin). The government argues that this court does not have jurisdiction over the shareholders' suit and that even if it did, the shareholders would lack the requisite standing to maintain it. Proceedings in this case are currently stayed, pursuant to this court's order of June 3, 1993 in *Winstar Corp., et al. v. United States*, No. 90–8C. Without disturbing the effect of this stay, the court now denies defendant's motion to dismiss insofar as it is based on the arguments that (1) this court has no jurisdiction over derivative suits such as that brought by the plaintiffs; (2) that plaintiffs do not have the requisite standing to bring their claims; and (3) certain provisions of the Financial Institution Reform, Recovery and Enforcement Act of 1989 (FIRREA) preclude plaintiffs' suit.

1. The facts listed below were gleaned from the plaintiffs' complaint and supporting documentation. As the government is the moving party, the court must assume the plaintiffs' facts to be true for the purposes of this motion.

2. Equitable was not in compliance with the net-worth requirement of 12 U.S.C. § 1730h (1982). Had FSLIC seized Equitable at that time, it would have been liable for approximately $300,-000,000 in insured deposits.

3. As discussed in the court's opinion in *Winstar v. United States*, 21 Cl.Ct. 112 (1990), the term "goodwill" is an economic concept associated with the purchase method of accounting. As explained in *Winstar*,

## FACTS [1]

Plaintiffs, shareholders of Ben Franklin, seek to recover approximately $181,000,000 for the loss of the value of their stock due to the government's breach of contractual agreements and the seizure of Ben Franklin. There are no longer any officers or directors of Ben Franklin and the receiver, the Resolution Trust Corporation (RTC), will not bring this suit against the United States. Plaintiffs allege that their shares became worthless when the government, through the Office of Thrift Supervision (OTS) and the RTC, took over the association on February 21, 1990, placed it in conservatorship, sold most of its assets, and finally placed it in receivership on September 7, 1990. OTS took over Ben Franklin pursuant to its interpretation of the Financial Institution Reform, Recovery and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101–73, 103 Stat. 183, enacted August 9, 1989.

Ben Franklin was a well managed thrift whose operations comprised 30% of the savings and loan market in Oregon. It was strong enough in 1982 to be able to acquire Equitable Savings and Loan Association (Equitable), a thrift in imminent danger of failing.[2] The excess cost of the acquisition of Equitable over its fair market value, known as "goodwill," [3] was $343 million. Ben Franklin was able to acquire Equitable without endangering its own solvency only because the government, through the Federal Home Loan Bank Board (FHLBB) and the Federal Home Loan Bank of Seattle (FHLB–Seattle) agreed to certain forbearances, allowing Ben Franklin to carry the goodwill on its books as a capital asset while

Under [the purchase method of accounting] ... the book value of the acquired thrift's assets and liabilities was adjusted to fair market value at the time of the acquisition. Any excess in the cost of the acquisition (which included liabilities assumed by the acquirer) over the fair market value of the acquired assets was separately recorded on the acquirer's books as 'goodwill.' In other words, the government agreed to allow the plaintiffs and others in similar circumstances to treat what was a deficit in capital as an asset. Goodwill was considered an intangible asset that could be amortized on a straight-line basis over a number of years.

21 Cl.Ct. at 113.

amortizing it over 40 years.[4] By so agreeing, the government was able to avoid having to pay many millions of dollars to the depositors of Equitable. Ben Franklin would thus be able to absorb the cost of the acquisition over a long period of time, and remain in compliance with the regulatory requirements.

In 1985, the government again approached Ben Franklin, this time inviting it to bid on the acquisition of Western Heritage Federal Savings and Loan Association (Western Heritage), another failing thrift institution. A similar transaction took place, this time resulting in approximately $6,800,000 in goodwill, which the government again agreed could be carried as a capital asset on Ben Franklin's books amortized over 25 years. In addition, the Federal Savings and Loan Insurance Corporation (FSLIC) made an $8,800,000 cash contribution, which, under forebearances granted by FHLBB to facilitate the acquisition, was added directly to Ben Franklin's regulatory capital. Further, the FSLIC agreed to indemnify Ben Franklin against certain liabilities up to $5,000,000. Lastly, FSLIC granted forbearances on the calculation of regulatory capital requirements for five years.[5]

In 1986, Ben Franklin converted from a mutual association to a stock association. FHLBB conditioned its approval of the conversion upon certain modifications of the agreements pertaining to these acquisitions, specifically that the amortization period for the goodwill resulting from the Equitable acquisition be reduced from 40 to 32 years. The goodwill on the Western Heritage acquisition was apparently not affected. Ben Franklin's prospectus notified prospective stock owners that Ben Franklin carried $322,400,000 of goodwill as of June 30, 1986. Apparently, the various agreements between Ben Franklin and the government were "reaffirmed and modified" in 1986 to take into account Ben Franklin's transformation into a shareholder-owned institution.

On August 9, 1989, in response to the crisis in the savings and loan industry, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 183 (1989). FIRREA created the Office of Thrift Supervision. 12 U.S.C. § 1462a (Supp.1993). The OTS was placed under the general oversight of the Department of the Treasury and made responsible for "the examination, safe and sound operation, and regulation of savings associations." 12 U.S.C. §§ 1462a, 1463 (Supp.1993). FIRREA also established the Resolution Trust Corporation, a corporation "deemed to be an agency of the United States to the same extent as the Federal Deposit Insurance Corporation [FDIC] when it is acting as a conservator or receiver of an insured depository institution." 12 U.S.C. § 1441a(b) (Supp.1993). The RTC was created to manage and resolve all cases involving savings and loan associations closed between January 1989 and September 1993 and was given conservatorship and receivership powers similar to those held by the FDIC. 12 U.S.C. § 1441a(b) (Supp.1993).

The passage of FIRREA, as interpreted and enforced by OTS, included new limitations on the inclusion of goodwill and cash contributions in regulatory capital, as well as shortened amortization periods. These changes resulted in the overnight insolvency of Ben Franklin. OTS took over the thrift on February 21, 1990, despite the facts that, among other things, it had experienced a substantial increase in net worth, had realized a profit for 16 consecutive calendar quarters preceding passage of FIRREA, and had submitted a capital plan to bring it into compliance with FIRREA. In addition, there was no evidence of mismanagement on the part of Ben Franklin's officers and directors.

In September, 1990, the named shareholders filed this suit on behalf of Ben Franklin. Approximately 1220 other shareholders owning over 1,140,000 shares had contributed to the funding of this case at the time of the

---

4. FHLB–Seattle also provided Ben Franklin several advances, which the latter was to repay. On June 30, 1989, Ben Franklin carried over $288,-000,000 of "goodwill" as an asset on its balance sheets.

5. These forebearances, set to expire in July 1990, were in effect at the time of Ben Franklin's seizure.

filing of the Amended Complaint. In its response brief, plaintiffs' counsel represented that the number of contributors was 2270, constituting almost half of the shareholders. Plaintiffs seek damages for breach of contract, rescission, and taking of property without due process of law or just compensation. They bring their claims both derivatively, on behalf of Ben Franklin, and individually, as intended beneficiaries of the agreements between the government and the institution.

## DISCUSSION

### A. Jurisdiction Over Shareholder Derivative Suits

■ The main issue raised by the government's motion is whether this court has jurisdiction over a shareholder derivative action. Derivative suits are nominally considered equitable actions, apparently because the common law did not allow such suits. Nevertheless, plaintiffs in derivative suits do not always seek equitable remedies, as the instant case reveals. It is clear that absent statutory authorization, this court cannot grant equitable relief. However, parties can use equitable defenses and can maintain at least some equitable actions before this court, so long as the relief sought is monetary. In *Quinault Allottee Asso. etc. v. United States*, 197 Ct.Cl. 134, 453 F.2d 1272 (1972), the government argued that the Court of Claims lacked jurisdiction over the plaintiffs' class action because such an action was equitable in nature. At that time, the court had no rule analogous to R.C.F.C. 23, which permits class actions. Nevertheless, the court still allowed the plaintiffs to file their suit:

> There is no reason why this court cannot use the [class action], if it is appropriate. So long as relief is confined to a money judgment, there is nothing in the type of jurisdiction we have, or the fact that claims in this court are normally against the United States, to deprive us of this modern aid to speedier and less repetitious litigation. Congress has limited us to monetary judgments but it has not said or implied that we cannot use new procedural techniques, if we consider them advisable, in deciding whether or not to make monetary awards

in fair and efficient fashion. The directive that waiver of sovereign immunity not be read expansively goes to the relief we can award, the subjects we can consider, and the timing of claims, not the intermediate procedural steps we take in cases plainly within our jurisdiction.

*Quinault,* 197 Ct.Cl. at 137–138, 453 F.2d at 1274. The court also rejected the government's claim that it lacked "equity jurisdiction" as being overly broad:

> Defendant repeats the ancient but inaccurate shibboleth that this court has no "equity jurisdiction," and then argues that since the class suit was originally a creature of equity we cannot use it. The correct premise is, not that we are without equity jurisdiction, but that we cannot grant nonmonetary equitable relief such as an injunction, a declaratory judgment, or specific performance. Where the relief is monetary, we can call upon such equitable concepts as rescission and reformation to help us reach the right result.

*Id.,* at 138 n. 1, 453 F.2d at 1274 n. 1.

Seven years later, in *Pauley Petroleum, Inc. v. United States,* 219 Ct.Cl. 24, 591 F.2d 1308 (1979), the Court of Claims undertook another examination of its equitable jurisdiction. The plaintiffs in *Pauley* were leaseholders of certain offshore lands in Santa Barbara Channel. A huge oil blowout there caused the government to revise its regulations regarding offshore drilling, allegedly harming the plaintiffs. In a jurisdictional attack, the government claimed that the "plaintiffs' claim of rescission because of mutual mistake or frustration" must fail because it was an equitable action. The court corrected the government's misunderstanding, citing among other cases *Quinault, supra,* and *Klamath & Modoc Tribes & Yahooskin Band of Snake Indians v. United States,* 174 Ct.Cl. 483, 490, 1966 WL 8850 (1966) (permitting use of the traditionally equitable tool of accounting to render a monetary judgment).

In the instant case, the government has cited a number of cases which it claims stand for the proposition that a derivative suit cannot be brought in this court. However, the government misreads those cases for that

proposition. In every case, the plaintiffs were either shareholders or officers of the corporation who wanted to represent that corporation *pro se*. *See e.g.*, *Whited v. United States*, 230 Ct.Cl. 963, 964–65, 1982 WL 1408 (1982) (holding that majority shareholder of closely held corporation cannot represent corporation *pro se* nor can sue government individually on contract between corporation and government); *S.R. Weinstock & Associates, Inc. v. United States*, 223 Ct.Cl. 677, 679–80, 650 F.2d 286 (1980) (stating that only attorneys at law admitted to practice are permitted to represent corporations); *Algonac Mfg. Co. v. United States*, 198 Ct.Cl. 258, 261, 458 F.2d 1373, 1375 (1972) (holding that counsel must be an attorney, not a shareholder representing company *pro se* ); *Sermor Inc. v. United States*, 13 Cl.Ct. 1 (1987) (holding that corporations are artificial entities created by law which require appearances in court to be made by agents; neither directors, officers, nor shareholders may appear on behalf of corporation).

The specific language of *Whited*, cited by the government in its briefs, is as follows:

> While we might have done so, we have never adopted a counterpart to Federal Rule of Civil Procedure 23.1, allowing stockholders to sue the government on behalf of their corporation. In the absence of such a rule, this panel of the court is clearly bound by our previous decisions in *Algonac Manufacturing Co.* and *S.R. Weinstock & Associates, Inc.* Those decisions are clear that a shareholder, even a majority or sole shareholder, may not bring suit as an individual alleging breach of his corporation's contract with the United States.

*Whited*, 230 Ct.Cl. at 965. The government would have this court accept this language as binding precedent that bars it from hearing any shareholder derivative suits. When read in context, however, the holding of the case appears to be quite different. The *Algonac* and *S.R. Weinstock* decisions were cited by the *Whited* court only as support for the rule against *pro se* representation by corporations. Even under the government's interpretation, the cases at most prohibit a shareholder from bringing suit as an individual on his corporation's contract with the government. The whole point of a shareholder derivative suit, however, is that the shareholder brings suit not on his or her own behalf, but on behalf of the corporation itself. Thus, the shareholders assert a right held not by themselves, but by the corporation—a right that the latter is either unwilling or, as in the instant case, unable to assert on its own. In this case, where the government has taken over and dissolved the corporation, this need for the derivative suit is particularly apparent and perhaps even poignant.

*Whited* is thus not wholly determinative of the issue of whether or not this court can hear a shareholder derivative suit. If the holding of that case is to be read as prohibiting shareholders from bringing suits as individuals based on their corporations' contracts, then it is inapplicable to the instant "true" derivative suit. If, on the other hand, *Whited* is to be read as prohibiting derivative suits on the grounds that this court has adopted no procedures to control such suits, then it is inconsistent with *Quinault*, which allowed jurisdiction over class actions under just the same circumstances. Allowing this suit and looking at the context of *Whited* makes it and *Quinault* quite consistent.

Ultimately, the key to this court's jurisdiction over any given cause of action is the type of relief sought. This is a simple and clear bright-line test that furthers the efficient administration of justice. This is the case regardless of whether the claim is brought as a procedural device based in equity such as a class action or a shareholder derivative suit. Plaintiffs in the instant case seek contract damages in the form of a monetary award and thus this court has jurisdiction over their claims.

**B. Plaintiffs' Standing to Bring Their Derivative Claims**

The government, in an attempt to distinguish *Quinault*, argues that the plaintiffs in that case were allowed to bring a class action only because each member of the class already had standing to bring his or her individual claims. This argument, however, misreads the definition of a derivative suit. As discussed above, plaintiff-shareholders in

a derivative suit bring their claims not on their own behalf, but on behalf of the corporation itself. They are not suing on any contractual right of their own, but on the rights held by the corporate entity. Thus, it is illogical to argue that plaintiffs in a derivative suit must have standing as individuals in order to bring their action—*the derivative nature of the suit makes their standing as individuals irrelevant*. This court's predecessor recognized this point when it stated that "[t]he general rule is that where stockholders do not allege that they are bringing a derivative suit on behalf of the corporation, and do not meet the requirements for bringing such a suit, they do not have standing to sue for alleged injuries inflicted on the corporation by a third party." *Robo Wash, Inc. v. United States*, 223 Ct.Cl. 693, 695, 1980 WL 13154 (1980). The logical conclusion of *Robo Wash*, then, is that if a plaintiff *does* allege—as in the instant case—that the suit is being brought derivatively, then they will have standing to sue on behalf of the corporation. Therefore, the court finds that the plaintiffs have the requisite standing.

## C. Plaintiffs' Standing as Individuals

■ Plaintiffs' standing to bring their derivative claims does not, however, extend to Count VIII of their complaint, which they have brought in their status as individual shareholders. In order to have standing to sue in their individual capacities, the plaintiffs must have been parties to the contract. *Whited*, 230 Ct.Cl. at 912. They must show that the government breached duties which the shareholders held personally and independently of their status as shareholders. *Robo Wash, Inc.*, 223 Ct.Cl. at 697. In the instant case, the plaintiffs have failed to meet these criteria. Thus, while in certain unusual circumstances a third-party beneficiary status may be accorded to a shareholder, generally this has not been the case. While every action of a corporation is supposed to benefit its shareholders, our law has not viewed this general benefit as making every shareholder a third-party beneficiary. If this were the case, the shareholder derivative action would

serve no purpose. The court must therefore dismiss the plaintiffs' individual, non-derivative claims against the government.

## D. FIRREA

■ The government's final argument is that even if the plaintiffs · can maintain a derivative suit in this court, various portions of 12 U.S.C. §§ 1441a, 1464, and 1821 prohibit such a suit. Briefly stated, those statutes provide the authority for FDIC and RTC conservatorship and receivership of failing thrifts. Typical of these statutes is 12 U.S.C. § 1464(d)(2)(E)(i) which, as amended by FIRREA, states that:

> A conservator shall have all the powers of the members, the stockholders, the directors and the officers of the association and shall be authorized to operate the association in its own name or to conserve its assets in the manner and to the extent authorized by the [director of OTS].[6]

The amended statute is substantially the same as the pre-FIRREA version it superseded, 12 U.S.C. § 1464(d)(6)(D), the main difference being that it adds "stockholders" to the list of those entities whose powers are inherited by the conservator. The government has argued that the inclusion of this term expanded the government's powers as conservator or receiver to the point where the amended statute now precludes any derivative suits from being brought by former shareholders of failed associations. The court rejects this argument, however, as being inconsistent with both logic and existing case law, as well as unsupported by legislative history.

To accept the government's argument of increased power would lead to the illogical conclusion that prior to the FIRREA amendment, 12 U.S.C. § 1464(d)(6)(D) created a loophole which allowed stockholders to sue on behalf of the association while all the entities that were mentioned in the statute, such as owners or directors, could not. If the amended statute vested the government with additional powers—specifically the pow-

---

**6.** The word "stockholder" was added to these statutes recently to include S & L's which were share holder-owned. Previously, most thrifts were "owned" through membership (as mutual associations), rather than through shares of stock.

ers held by the stockholders of the association—then those powers could not have existed prior to the amendment. The pre-FIRREA case law makes it clear, however, that where former shareholders were allowed to file derivative suits, they could only do so after making an unsuccessful demand on the government-receiver (or demonstrating the futility of doing so). The reason for this demand requirement was precisely because the receiver "represents the bank, its *stockholders* and creditors." *Landy v. Federal Deposit Insurance Corp.*, 486 F.2d 139, 147 (3rd Cir.1973); citing *O'Connor v. Rhodes*, 79 F.2d 146, 148 (D.C.Cir.1935) (emphasis added). Thus, both logic and precedent compel the conclusion that because the government, as receiver, had the powers of stockholders in the associations prior to FIRREA, that statute's addition of the word "stockholder" did not expand the powers of the conservator/receiver, but merely made it clear that thrifts with stockholders were included along with the more traditional mutual or membership thrifts. Of course, the main power that the conservator gets that was held by shareholders is the power to choose directors and thus set corporate policy. It is clear that the conservator would never get the beneficial interest of the shareholders if any were left after the settling of accounts and the paying off of creditors and depositors.

In addition, the case law both prior to and subsequent to the passage of FIRREA is consistent in allowing former shareholders of failed financial institutions to bring derivative suits, provided they make the requisite demand on the receiver. For example, in *Landy v. Federal Deposit Insurance Corporation*, 486 F.2d 139 (3rd Cir.1973), the Third Circuit held that shareholders in an insolvent bank did not have standing to bring derivative actions in the absence of making a demand on the FDIC, the bank's receiver, to bring the suit itself. The court emphasized, however, that its decision was based on the plaintiffs' failure to "supply with particularity the reasons for failing to make the demand required by Rule 23.1." *Landy*, 486 F.2d at 148. The court specifically stated that:

A derivative suit by shareholders should not be precluded merely because a bank is in the receivership of the FDIC.... Con-

gress has given no indication that it intended to preclude derivative suits by the shareholders of a national bank in receivership. When a receiver refused to bring suit or 'where it would be a vain thing to make a demand upon [it], and it is shown there is a necessity for a suit for the protection of the interests of creditors,' a stockholder is free to sue.

*Id.* (citing *O'Connor v. Rhodes*, 79 F.2d 146, 149, *aff'd sub nom. United States Shipping Board Merchant Fleet Corp. v. Rhodes*, 297 U.S. 383, 56 S.Ct. 517, 80 L.Ed. 733 (1936). The Fifth Circuit has also held that "[a] derivative action is not precluded when a bank is placed into receivership." *Gaubert v. United States*, 885 F.2d 1284, 1290 n. 6 (5th Cir.1989) *rev'd on other grounds* 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). The *Gaubert* court noted that the traditional demand requirement of derivative suits still applied, noting that "any demand to bring suit must be made upon the receiver or agency possessing the right to assert the corporation's claims ... [although] it is also possible to allege demand futility." *Id.* Other courts have also enforced this demand requirement, thereby recognizing the power of former shareholders to bring post-receivership derivative suits if the requirement is met. *See e.g. In re Sunrise Securities Litigation*, 916 F.2d 874 (3d Cir.1990) (depositors' suit against officers and directors of association had to come through efforts of FDIC on their behalf or through derivative suit after an unsuccessful demand upon FDIC); *Womble v. Dixon*, 752 F.2d 80 (4th Cir.1984) (shareholders of failed association seeking to bring derivative suit against persons not being sued by FSLIC receiver need not bring formal demand on receiver where it already had notice of alleged wrongdoing).

In response to the weight of the above cases, the government has cited a lone district court case to support its argument that the appointment of a receiver precludes derivative suits by former shareholders of failed financial institutions. In *First Sav. & Loan Asso. v. First Federal Sav. & Loan Asso.*, 547 F.Supp. 988 (D.Haw.1982), the United States District Court for the District of Hawaii held that upon being appointed the

receiver of the institution involved in the case, the FSLIC, under the former 12 U.S.C. § 1464(d)(6)(A), acquired all of the powers of the members, directors, and officers of the institution. *Id.* at 994. The court then went on to conclude from this, however, that "no suit can be entertained and no relief affecting the powers and functions of a receiver may be sought or accorded other than under the provisions of § 1464(d)(6)(A) of Title 12" and that "only a receiver may institute, prosecute or maintain claims on behalf of any association placed in receivership." *Id.* at 994–995. We agree with the *First S & L* court that a failed financial institution loses all rights to sue on its own behalf once it is placed in receivership. We disagree, however, that this necessarily precludes former shareholders from suing derivatively in instances where the receiver fails to enforce the right which the shareholders seek to enforce. Just as the receiver stands in the shoes of the former institution's management and directors for all governance, the shareholders have the same derivative rights to remedy its failure to assert corporate interests as they have with respect to a negligent corporate management via the derivative action against third parties who have injured the corporation. Nothing in the statutory scheme turns the receiver into an "infallible" manager with "unfettered discretion" just because the receiver happens to be the government.

Finally, in *Branch v. FDIC,* 825 F.Supp. 384 (D.Mass.1993), the United States District Court for Massachusetts held that 12 U.S.C. § 1821(d)(2)(A)(i)—one of the FIRREA statutes cited by the defendant in the instant case—"[did] not alter the settled rule that shareholders of failed national banks may assert derivative claims." *Branch,* 825 F.Supp. at 405. The plaintiff in *Branch* was the trustee of a failed national bank who brought claims on behalf of the bank and two of its former subsidiary banks against the FDIC. The plaintiff claimed that the FDIC, in its capacity as receiver for a third of the bank's subsidiaries, made certain transfers of funds from the bank to that subsidiary in order to reduce its (the FDIC's) overall costs in handling the subsidiary's failure by increasing its asset base at the expense of the parent bank and its other subsidiary banks.

*Id.* at 393. The plaintiff sought to recover those transferred funds and brought a number of claims against the FDIC, some of which were brought derivatively on behalf of the first two subsidiary banks. The FDIC moved to dismiss these derivative claims arguing, *inter* *alia,* that under § 1821(d)(2)(A)(i), the plaintiff was no longer a shareholder of the two subsidiaries since the parent bank effectively ceded its shares to the FDIC upon the latter's appointment as the subsidiaries' receiver. The District Court rejected this argument, noting that while the text of § 1821(d)(2)(A)(i) gave the receiver all the rights and powers of the stockholders of a failed institution, under another FIRREA statute, § 1821(d)(11)(B), the shareholders remained entitled to distribution of the excess amounts after payment of all claims and expenses. *Id.* at 404. In language highly applicable to the instant case, the court concluded:

> In light of the language and juxtaposition of these two sections, this Court cannot conclude that Congress intended to preserve shareholder's rights to the residual assets of the failed financial institution, yet terminate the shareholders' ability to protect the failed institution's interests. Such a bold departure from common law adjudicatory principles would place unfettered discretion in the hands of FDIC–Receiver, and might deny shareholders any avenue of redress should the FDIC improperly neglect to assert the failed institution's rights. In the absence of legislative history supporting such a decisive derogation of shareholders' common law rights, the Court cannot interpret section 1821(d)(2)(A)(i) to divest failed institutions' shareholders of their rights to assert a derivative action on behalf of the failed institution.

*Id.* at 404–405.

We agree with the *Branch* court's view. So long as the former shareholders make an adequate demand on the receiver (or adequately show the futility of such a demand), the fact that a failed association has been placed into receivership does not preclude them from bringing a derivative suit. The plaintiffs in the instant case demanded that

the RTC, Ben Franklin's receiver, sue the United States on the association's behalf. This demand was ignored.

Ultimately, the government in the instant case, like the FDIC in *Branch*, is faced with a conflict of interest. The government contends that the RTC is in the best position to sue on behalf of the shareholders since as receiver it is statutorily obligated to look after all parties' interests. The government fails to appreciate the disingenuousness of this position. It is a little like the fox arguing that it is in a better position to know the chickens' interests than the chickens. OTS, an arm of the Treasury Department, made the decision to put Ben Franklin into receivership. RTC, another arm of the Treasury Department, is the receiver. Finally, the government is also the debtor whose alleged breach of contract led to the receivership in the first place!

The plaintiffs' underlying claim is that FIRREA took away Ben Franklin's rights to count the supervisory goodwill under the terms of the 1982 agreement. The government now contends that by adding the word "shareholder," the same Act also took away plaintiffs' ability to seek any remedy for that action. The idea that the RTC will adequately protect the rights of shareholders by suing itself is nothing more than a rhetorical sleight of hand and is of little comfort to former shareholders who suddenly lose not only their rights and interests in a failed institution but also the right to litigate those rights. Especially in the absence of any direct evidence that Congress intended it, this court cannot endorse such a departure from both logic and the common law. As was stated over a half century ago, "[t]o say that in every case the rule of exclusive power in the receiver is positive and admits of no exception, would be to sacrifice substantial rights to matters of form." *O'Connor v. Rhodes*, 79 F.2d 146, 148 (1935). The court therefore construes the various statutes to permit derivative suits in situations such as the one at bar.

## CONCLUSION

The court holds that the plaintiffs may file their derivative suit. It is the nature of the remedy sought—money damages here—which determines this court's jurisdiction over a given cause of action. A derivative suit, although technically an "equitable" form of action, falls within this court's jurisdiction so long as monetary relief is sought. Moreover, plaintiffs in a derivative suit are not required to have standing as individuals in order to bring their claims, since the suit is brought on behalf of the corporation, which did have standing based on its contracts with the defendant. However, count VIII of the complaint, which is based on plaintiffs' claims as individual stockholders, must be dismissed for lack of standing. Finally, the court holds that FIRREA does not bar such a suit even after a thrift is placed into receivership. Therefore, the government's motion to dismiss, with the exception of Count VIII, is denied.