BLUEBONNET SAVINGS BANK, F.S.B., Stone Capital, Inc., and James M. Fail, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 95–532C.

United States Court of Federal Claims.

March 2, 1999.

I. Thomas Bieging, with whom were Alexander J. Brittin and Thomas F. Burke, McKenna & Cuneo, L.L.P., Washington, D.C., for plaintiffs Bluebonnet Savings Bank FSB and Stone Capital Inc., Mitchell R. Berger, Patton Boggs, L.L.P., Washington, D.C., was of counsel.

Mitchell R. Berger, with whom were Michael J. Schaengold and Michael N. Druckman, Patton Boggs, L.L.P, Washington, D.C., for plaintiff James M. Fail. I. Thomas Bieging, McKenna & Cuneo, Washington, D.C., was of counsel.

Elizabeth M. Hosford, with whom were Kenneth M. Dintzer, Henry R. Felix, David Hoffman, Craig R. Gottleib, Andrea H. Gribble, Jeanne E. Davidson, Assistant Director, David Cohen, Director, Commercial Litigation Branch, Civil Division, and Frank W. Hunger, Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant.

## *OPINION*

SMITH, Chief Judge.

This case is before the court on the parties' cross-motions for summary judgment as to liability, defendant's motion to dismiss and defendant's motion to strike one of plaintiffs' claims. For the reasons discussed below, plaintiffs' motion for summary judgment as to liability is granted, and defendant's cross-motion for summary judgment, its motion to dismiss, and its motion to strike are denied.

## BACKGROUND

This case involves the 1988 assisted acquisition of the assets and liabilities of 15 failed thrifts from the Federal Savings and Loan Insurance Corporation (FSLIC) by Mr. James M. Fail, through the CFSB Corporation (now Stone Capital), a thrift holding company, which owned the newly-created thrift, Consolidated Federal Savings and Loan Association (now Bluebonnet Savings Bank, FSB), formed for purposes of the acquisition. The plaintiffs allege that the passage of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L. 101–73, 102 Stat. 183, and its implementing regulations, breached capital and dividend forbearances granted plaintiffs in the contract.

In the wake of the United States Supreme Court's decision in *United States v. Winstar*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), the court implemented procedures to deal with the 120–plus related cases on the court's docket. Pursuant to the Omnibus Case Management Order entered September 18, 1996, plaintiffs filed a "short-form" motion for summary judgment as to the threshold liability issues of whether there was a contract and whether FIRREA breached the contract. Defendant cross-moved for summary judgment, moved to dismiss plaintiffs James M. Fail and CFSB for lack of standing, and moved to strike one of plaintiffs' claims regarding the regulatory treatment of subordinated debt.

The court dealt with the broad group of liability issues defendant contended were still unresolved after the Supreme Court's *Winstar* decision in *California Federal Bank v. United States*, 39 Fed.Cl. 753 (1997). In light of the court's reasoning in *California Federal*, the court ordered defendant to show cause why summary judgment should not be entered in all *Winstar*-related cases where summary judgment motions had been filed. This generated a series of briefs which the court has considered in resolving the pending motions in this case. In addition, the court has considered the briefing on Common Issue 11, which involves the standing of various investor plaintiffs to sue. This case was selected, along with four others, to ventilate the sundry investor standing issues, which culminated in oral argument on July 7, 1998.

As part of the show cause process, defendant has identified essentially five defenses to the entry of a liability judgment in favor of plaintiffs, and requiring entry in its favor. First, defendant contends that plaintiff James M. Fail lacks standing to sue for breach of contract because he did not sign the Bluebonnet assistance agreement and that CFSB has failed to state a claim upon which relief can be granted because the government did not breach a duty owed it separate from its status as shareholder. Second, plaintiffs' claim of a right to pay dividends,

per the forbearance letter, is in direct conflict with the capital maintenance agreement, creating a patent ambiguity which must be construed against plaintiffs. Third, even if defendant had a duty to pay the dividends, the government did not breach the duty because plaintiffs failed to fulfill a condition precedent. Fourth, defendant contends that plaintiffs' claim that the government agreed to permit Bluebonnet to count subordinated debt as regulatory capital was improperly pled because plaintiffs failed to properly plead the claim pursuant to RCFC 15, and fifth, that, regardless of any pleading deficiencies, the subordinated debt claim is barred by the 1995 settlement agreement.

## FACTS

Plaintiffs point to several documents, which, taken together, create the Transaction Agreement. The documents are:

1) The December 22, 1988 letter from the Federal Home Loan Bank Board (FHLBB) to Mr. Fail, which contains capital and dividend forbearance provisions (the Forbearance Letter). The Forbearance Letter provided Bluebonnet with a ten-year capital forbearance provided it met certain regulatory capital levels in each of the ten years. The Forbearance Letter also specified that, beginning one year after the date of the letter, Bluebonnet would be entitled to pay cash dividends of up to fifty percent of income, provided it met the negotiated lower capital levels.

2) The December 22, 1988 Assistance Agreement, signed by Bluebonnet, CFSB and the FSLIC, which contained the Integration Clause.

3) The December 22, 1988 Capital Maintenance Agreement, signed by Mr. Fail, on his own behalf and on behalf of Bluebonnet and CFSB.

4) The December 22, 1988 FHLBB Resolution (Resolution 88–1384P) approving the transaction, along with the March 8, 1989, Technical Amendment (No. 768P), which permitted the inclusion of certain subordinated debt as regulatory capital.

Pursuant to the Transaction Agreement, the government, through the FSLIC, agreed to infuse the newly-created thrift with more than $3 billion in cash, and the acquirors agreed to provide $120 million over a two-year period. In exchange, the government agreed to certain capital and dividend forbearances. The government in this litigation concedes the existence of a Transaction Agreement that constitutes a contract. The government, however, attaches two important provisos to that stipulation: the first is that the contract was between Bluebonnet and the FSLIC, and Mr. Fail was not a party and CFSB, as Bluebonnet's sole shareholder, was owed no separate duties. The second proviso is that the Transaction Agreement includes two letters, which the government contends require Bluebonnet to provide the source of funds for the remaining $12.5 million infusion to be provided by an outside partner before dividends can be distributed. The government thus concedes the existence of a contract with Bluebonnet regarding the capital forbearances, but denies both the standing of plaintiffs Fail and CFSB to bring claims for breach of contract and, regardless, to enforce the dividend forbearances.[1]

The court will thus address the five defenses which defendant contends stand as a bar to the entry of summary judgment for plaintiffs and require entry of judgment in favor of the government.

## STANDING OF MR. FAIL AND CFSB TO MAINTAIN BREACH OF CONTRACT ACTIONS

Defendant states in one of its show cause filings: "Plaintiff James Fail does not pos-

---

1. The question of who can prosecute a claim for breach of contract is critical in this matter. Pursuant to an August 2, 1995 settlement of ongoing District Court litigation between the FDIC and the bank parties (which, in this instance, refer to Bluebonnet, CFSB and Mr. Fail), the claims of Bluebonnet, CFSB and Mr. Fail "relating to capital forbearances, dividend forbearances, and dividend payments" were excepted from the settlement. However, pursuant to the terms of the settlement the damages Bluebonnet was permitted to seek against the government in the Court of Federal Claims were limited to one dollar, while plaintiffs CFSB and Mr. Fail were limited to no more than $136,075,000. Obviously, should Mr. Fail and CFSB not have standing to bring their claims, there is little reason to believe that the case would continue for that one dollar of alleged damages.

sess standing to assert the breach of contract claims in this case because he was not a signatory to the Bluebonnet assistance agreement, and CFSB, notwithstanding its status as a signatory to the assistance agreement, has failed to state a claim upon which relief can be granted because the duties it alleges were breached by the government were owed solely to Bluebonnet, the thrift, and CFSB is merely a shareholder of the thrift." Resp. of the United States to Pls.' Reply to the Government's Show Cause Resp. and Prop. Order at 4–5.

Plaintiffs make two principal arguments in support of standing. The first is that two rulings in the prior District Court litigation establish that Mr. Fail and CFSB are parties. The second is that, regardless, Mr. Fail and CFSB are parties to the contract who were owed duties by the government.

The court need not review whether the District Court rulings have already established that Mr. Fail and CFSB are parties to the contract, because it is manifestly clear to the court that they are parties. The government's argument—that only Bluebonnet, and neither Mr. Fail nor CFSB, can sue for breach of contract—distorts the essence of the contract.

The court need not revisit the history of the savings and loan crisis. Suffice it to say it has been exhaustively done in prior opinions. *See, e.g., United States v. Winstar Corp.,* 518 U.S. 839, 843–856, 116 S.Ct. 2432, 2440–2446, 135 L.Ed.2d 964 (1996); *Winstar Corp. v. United States,* 64 F.3d 1531, 1534–36 (Fed.Cir.1995) It is indisputable that the Bluebonnet transaction is no different, in terms of the aims of bank regulators, than those discussed in these prior opinions. In this case, regulators induced a private investor to capitalize a newly-formed thrift out of the wreckage of 15 failing ones, in exchange for substantial cash assistance and certain regulatory forbearances. These promises were made, it should surprise no one, to induce Mr. Fail to take over this "floating hulk," invest his own capital in the enterprise, and manage the new enterprise. The

agreement was memorialized in several documents.

The government's interpretation, though, turns the obvious nature of this transaction on its head. In the government's view, Bluebonnet is the only party that has standing to sue, but Bluebonnet is more properly viewed as the result created by the Transaction Agreement. Absent the essential agreement between Mr. Fail, CFSB and the government regulators, Bluebonnet is nothing more than a conglomeration of insolvency that is the responsibility of the FSLIC. The glue to this transaction is the agreement of the FSLIC to provide cash assistance and certain forbearances in exchange for Mr. Fail's capital and management commitment.

Although the idea does not seem difficult to grasp, it is certainly underscored by a cursory examination of the nature of the promises that plaintiffs believe were breached. The capital forbearance, while designed to enable the newly-formed entity to survive, also serves as a guaranty of sorts to the investor or investors that its capital infusion is protected. The purpose of the dividend forbearance is even more transparent. The government states: "The purpose of the forbearances was to protect the newly formed institution, Bluebonnet, from adverse regulatory action resulting from problems inherited from the fifteen failed thrifts which were merged to create Bluebonnet." Def.'s Reply at 10. This is a nice recitation of the purpose of forbearances, but it begs the question of why such assurances are necessary to guarantee that dividends could be paid to the investor of an insolvent institution. Such a provision can only be read as designed to ensure that Mr. Fail and CFSB could receive dividends notwithstanding the capital problems of the new institution. Bluebonnet, as a discrete entity separate from its investors, gains no advantage by this provision. Indeed, the only plausible way to understand the provision is as a cash flow guaranty (provided, of course, other conditions are met) to CFSB and Mr. Fail.[2]

---

2. Defendant spends much time criticizing the "self-serving" comments of Mr. Fail and others regarding the damage done to him and CFSB by

breach of the dividend forbearance provision. To the extent this is an issue, it is not related to

Defendant argues that Mr. Fail cannot maintain this action because he is not a signatory to the Assistance Agreement and that, although it is a signatory to Assistance Agreement, CFSB cannot maintain the action because it is owed no duty separate from that owed Bluebonnet. Preliminarily, defendants signatory argument is quickly put to rest once the entire transaction is understood. That is, the Assistance Agreement, forbearance letter, etc. are not discrete contracts but parts of the overall transaction agreement as discussed above. Moreover, there is no requirement that one be a signatory to the contract. Instead, one must be a party, and both Mr. Fail and CFSB meet that requirement.

The cases cited by defendant, *Robo Wash, Inc. v. United States*, 223 Ct.Cl. 693 (1980), *Whited v. United States*, 230 Ct.Cl. 963 (1982), and *Suess v. United States*, 33 Fed.Cl. 89 (1995), stand for the proposition that shareholders cannot sue to enforce the contract rights of the corporation. As the government notes, citing *Suess*, in order to have standing to sue, a shareholder must have been a party to the contract. *Suess*, 33 Fed.Cl. at 94. Here, as discussed above, that is the case: CFSB and Mr. Fail were parties to the contract. It is also of no moment that CFSB and Mr. Fail are shareholders, so long as the government breached duties owed them personally, and independently, of their status as shareholders. *Id.* at 94; *Robo Wash*, 223 Ct.Cl. at 697.

The line of cases cited by both parties stands for the proposition that shareholders of a firm who do not have privity cannot maintain an action on their own behalf. That is, shareholders, whose only conceivable interest would be a diminution in the value of their stock, cannot coopt the claim of the firm. Here, however, while defendant owed duties to Bluebonnet, it also owed duties to Mr. Fail and CFSB; the fact that these duties overlap does not mean that they are not also owed directly to Mr. Fail and CFSB. Indeed, the very structure of the transaction was designed to not only make the new entity, Bluebonnet, viable, but to also provide liquidity to CFSB and Mr. Fail, as sole shareholders of the new entity.[3]

Mr. Fail and CFSB, as parties to the contract, have pled direct, non-derivative claims, and have alleged duties owed directly to them outside of their status as shareholders. Thus, they have standing to maintain their claims.

## PATENT AMBIGUITY OF DIVIDEND FORBEARANCE PROVISION

Defendant argues that the forbearance letter's dividend distribution provision conflicts with a provision of the Capital Maintenance Plan. As the government states: "the Forbearance letter appears to permit Bluebonnet to pay dividends so long as it maintains capital at a level consistent with the Capital Plan, while the Capital Maintenance Agreement clearly precludes dividend distributions if this distribution would decrease capital to a level below that required by Section 561.13." Def.'s Cross–Mot. at 28. Defendant contends that this creates a patent ambiguity which must be construed in favor of the government and against the contractor.

Plaintiffs respond there is no patent ambiguity: the parties agreed that the dividend forbearance was keyed to the Capital Plan set forth in the forbearance letter, and that the Capital Maintenance Agreement governed the conditions under which the thrift could be seized. Plaintiffs argue that principles of contract construction, as well as the intent by the parties evidenced both contemporaneously and after the contract was signed, support this interpretation. Plaintiffs argue further that, to the extent there is any ambiguity, it should be construed against the government.

---

the question of liability, but to damages, and can be dealt with, if necessary, by the Trial Judge.

3. The court notes that, even were Mr. Fail and CFSB not found to be parties that could enforce duties owed them, it is clear that, pursuant to the Federal Circuit's reasoning in *Montana v. United States*, 124 F.3d 1269 (1997), they would be third party beneficiaries who could enforce duties owed them under the contract. As the Federal Circuit stated, "the contract must 'reflect the express or implied intention to benefit the third party.'" *Id.* at 1273. The contract in this case unquestionably expresses an intention, both express and implied, to benefit Mr. Fail and CFSB.

The forbearance letter permits Bluebonnet, beginning one year after the Effective Date of the transaction, to pay dividends of up to fifty percent of income, so long as the level of regulatory capital is in compliance with the Capital Plan. The requirements of the Capital Plan, in turn, are outlined in the preceding paragraph of the forebearance letter. Section 4(d) of the Capital Maintenance Agreement, however, does not permit the payment of any dividend that would reduce its Regulatory Capital below the Required Regulatory Capital Level, which the definitions section of the Capital Maintenance Agreement indicates is governed the "Regulatory Capital Regulation" set forth at 12 C.F.R. § 563.13(b). In other words, the forbearance letter ties the payment of any dividends to meeting the requirements of the Capital Plan as set forth in the forbearance letter, while the Capital Maintenance Agreement ties the payment of any dividends to the maintenance of the standard capital levels set by regulation.

Notwithstanding the efforts of plaintiffs, these two provisions cannot be harmonized. However, after careful review of the documents comprising the contract, the circumstances surrounding the execution of the agreement, and the understanding of the parties, particularly of the government, at the time the agreement was entered, the court believes that the forbearance letter's provision, rather than Section 4(d) of the Capital Maintenance Agreement, governs the conditions under which dividend distributions can be made by Bluebonnet.

 As the government points out, an ambiguity is patent "if it's so glaring as to raise a duty to inquire." *Newsom v. United States,* 230 Ct.Cl. 301, 303, 676 F.2d 647 (1982). In this instance, the contract documents, as well as the circumstances surrounding the execution of the agreement, argue against finding that there is a patent ambiguity. As plaintiffs emphasize and the government concedes, the various documents comprising this very complex agreement were provided to plaintiffs no more than 48

hours prior to closing. The dividend forbearance, tied to the Capital Plan numbers, is spelled out quite explicitly and clearly in the first two substantive paragraphs of the document. The Capital Maintenance Agreement is not nearly so clear: Section 4(d) refers to a prohibition against the payment of any dividends which would reduce regulatory capital below the Required Regulatory Capital Level. That term, however, is defined in Section 1(s), which in turn requires a reference to Section 1(q). The discrepancy between the two provisions is not immediately clear,[4] and certainly is not so glaring that the contractor in this instance had a duty to inquire, when the contractor had just two days to review the documents comprising the agreement before closing.

The duty to inquire created by a patent ambiguity exists to protect the government from its own poorly drafted documents. This duty requires a contractor who has reason to know of the ambiguity to take steps to correct it. In such a circumstance, the contractor cannot benefit from the drafter's ineptitude by attributing its unilateral meaning to the ambiguous provision or provisions. In this instance, though, given the multitude of documents and complexity of the transaction, the speed with which it was done, and the relative prominence and simplicity of the dividend forbearance contained in the forbearance letter compared to the boilerplate yet obtuse language of the Capital Maintenance Agreement, the facts all suggest that the ambiguity was anything but patent. Instead, it was the consequence of the complexity of the transaction and the brevity of the review.

 Since the ambiguity is not patent, the court must apply standard rules of contract construction, in an effort to "discern the parties intent at the time the contract was signed." *Winstar Corp. v. United States,* 64 F.3d 1531, 1540 (Fed.Cir.1995). It is clear from the documentary evidence in the record, that both plaintiffs and the government regulators agreed that the provisions of the forbearance letter governed the distribution of dividends. The government criticizes as

---

4. The court notes that the difficult task of determining what the Capital Maintenance Agreement required was made even more difficult by the government's typographical error in its cross-motion, which omitted an important line of Section 4(d) of the Capital Maintenance Agreement.

"self-serving" the statements of Harry Carneal, Mr. Fail's chief negotiator, that the forbearance letter dividend provision was the *sine qua non* of the contract and governed the dividend provisions. The government ignores, however, the contemporaneous evidence of its own agents that the forbearance provision in the forbearance letter governed the rights of plaintiffs to declare dividends. The legal opinion transaction memo from the FHLBB Office of General Counsel to the FSLIC Division Office of General Counsel, dated December 22, 1988 (the date the transaction closed) stated:

> As part of the transaction the Acquirors have agreed to enter into a so-called "prenuptial" agreement [the Capital Maintenance Agreement] which would provide that in the event that Consolidated's [Bluebonnet's] regulatory capital falls below a designated percentage, and the Acquirors are unable to or refuse to infuse sufficient additional equity capital to restore Consolidated's capital to its minimum capital requirement, mechanisms would be triggered which would enable the Board to transfer control of Consolidated to the FSLIC.
>
> In addition, the standard dividend limitations would be modified as part of the transaction. Beginning one year following the Closing Date, the institution would be permitted to pay cash dividends in an amount of up to 50 percent of net income for a fiscal year, provided the association's level of regulatory capital is no less than 1.75 percent of total liabilities, to the extent that such payment would not cause regulatory capital to fall below 1.75 percent. This percentage floor would increase by .25 for years two through five, by .50 percent for years six through eights (sic), and by 1.0 percent years none (sic) and ten until it reaches 6.0 percent upon expiration of the Assistance Agreement, after which the requirement shall be the greater of 6.0 percent or the fully phased-in capital requirement.

This second paragraph is a recitation of the dividend forbearance tied to the capital requirements contained in the forbearance letter's Capital Plan.

It is clear, then, that the government understood the agreement *at the time it was made* to give Bluebonnet the right to declare dividends subject to the strictures of the forbearance letter, not the Capital Maintenance Agreement. The fact that government regulators, several years after the contract was entered, relied on the provision of the Capital Maintenance Agreement to deny dividend distributions says nothing about the intent of the parties at the time the contract was entered, which is clear from the government's own documents.

It thus appears that plaintiffs' "self-serving" interpretation is no different than that of the *government regulators who agreed to* the deal, and that plaintiffs' interpretation is consonant with the intent of the parties. That is, the distribution of dividends was to be governed by the forbearance letter; the ability of the government to seize Bluebonnet for failure to meet capital requirements was to be governed by the Capital Maintenance Agreement. The discrepancy between the two provisions does not render irrelevant the clear intent of the parties, as stated by plaintiffs and evidenced in the FHLBB legal opinion offered the day the transaction was consummated.[5]

## THE FAIL AND CARNEAL LETTERS

■ Defendant concedes the existence of a contract with Bluebonnet (and not Mr. Fail and CFSB) and the FHLBBB and the FSLIC concerning the acquisition and operation of the fifteen thrifts that resulted in the creation of Bluebonnet, provided that two letters are considered contract documents. The two letters are a December 21, 1988 letter from Mr. Fail to Stuart Root, Executive Director of the FSLIC, and a December

---

5. The court notes that the government's interpretation would render an important provision of the contract a nullity. The court thus believes that its interpretation is consistent with the general rule of contract construction that "an interpretation which gives a reasonable meaning to all parts of an instrument will be preferred to one which leaves a portion of it useless, inexplicable inoperative, void, insignificant, meaningless, or superfluous." *United States v. Johnson Controls, Inc.,* 713 F.2d 1541, 1555 (Fed.Cir. 1983). The court declines to read one of plaintiffs' requested forbearances out of the contract.

22, 1988 letter from Harry T. Carneal to Mr. Root. Mr. Fail's letter states:

> Let me state at the outset my commitment to arrange for the full capital infusion described in the Term Sheet ($120 million or 3.75% of total current liabilities). My specific commitment in this letter is to fund *out of my own resources $107.5 million (3.4% of liabilities) of that total.* Under our business plan, we will fund the remaining $12.5 million through a tax advantaged partner.

(emphasis in original). Mr. Carneal's letter, which was dated the date of the closing, states:

> The purpose of this letter is to confirm my conversation with your associate, Rob Roe, regarding the capital infusion to be made by the investors in this package. As discussed with Mr. Roe, the investors agree that the resulting thrift will make no distributions of dividends until such time as a commitment with regard to the remaining $12.5 million capital infusion (as described in the letter from James Fail to you of this date [actually the day before]) is secured and submitted to the satisfaction of the FSLIC.

Defendant contends that taken together, these two provisions created a binding promise of plaintiffs to secure and submit the source of funding for the final $12.5 million in capital prior to any dividend distributions. Because, according to defendant, Bluebonnet did not do so until December 20, 1990, it failed to satisfy a condition precedent to Bluebonnet's distribution of dividends, so that the regulators' failure to authorize dividends was consistent with the contract.[6]

Plaintiffs make a multi-tiered response to defendant's argument. Plaintiffs contend first that the letters are not binding contract documents but are non-binding "comfort letters." Second, even if they are part of the contract they are not material, which plaintiffs contend is evidenced by their timing and the government's own actions. Third, even

should the court find the letters material, plaintiffs' duties were excused by the government's prior material breach in passing FIR-REA. Fourth, even if the prior material breach did not excuse plaintiffs' performance, then the government's own actions made the performance impossible. Lastly, even if the government's actions did not make performance impossible, plaintiffs fully or substantially performed.

The court agrees with defendant that the letters are not comfort letters, but comprise a commitment by the plaintiffs to secure and submit a source of funding for the last $12.5 million before declaring a dividend. The plaintiffs quote a law review article in explaining comfort letters:

> A comfort instrument is normally given by a "third party" to assure a party to a transaction regarding some element of value or credit. The third party intends to provide an incentive for one of the principals to enter into a transaction, while not becoming legally responsible itself. The comfort instrument can be found in numerous fields of business and finance. They are generally viewed as not creating any legally enforceable obligations.

Larry A. DiMatteo, *The Norms of Contract: The Fairness Inquiry and the "Law of Satisfaction"—A Nonunified Theory,* 24 Hofstra L.Rev. 349, 429 (1995). Plaintiffs then point out that Mr. Carneal signed the critical letter (which contains the alleged contractual commitment) in his capacity as Executive Vice President of Lifeshares Group, Inc., which plaintiffs cite as a potential investor in the Bluebonnet deal. Further, plaintiffs contend that there is no independent consideration recited in the letter.

No matter how plaintiffs try to style it, these letters, taken together, cannot be viewed as comfort letters. First, Mr. Carneal is not a "third party": he was, by plaintiffs' own account, the chief negotiator on behalf of the Mr. Fail, and the individual that plaintiffs rely on principally in their papers

---

6. Defendant's position regarding the status of these letters essentially undercuts defendant's argument that Mr. Fail has no privity of contract with the government. As plaintiffs point out, "Mr. Fail could not have made a contract prom-ise *to* the Government pertaining to his right to receive dividends, without reciprocally being a promisee of the Dividend Forbearance (emphasis in original)." Pls.' Reply to Government's Show Cause Resp. at 17.

in explaining what happened in this transaction. Further, the fact that he signed the letter as an executive of Lifeshares means little: Mr. Fail is the sole shareholder of Lifeshares. These letters simply cannot be read as an effort by a "third party" to encourage another party to enter into a contract. Mr. Carneal was not an independent third party. He was Mr. Fail's employee and chief negotiator, and his authority to act on behalf of Mr. Fail is not challenged by plaintiffs.

What's more, plaintiffs' observation that there was no independent consideration recited in the letter is inconsistent with their view of this transaction as embodied in a series of agreements. This is not an instance where each piece of paper embodies a separate contract, with its own offer, acceptance, meeting of the minds, and consideration. Rather, as plaintiffs argue, and defendant agrees (so long as the Fail and Carneal documents are included), there is a Transaction Agreement, embodied in several documents, that evidences a contract. Each piece of paper cannot be viewed in a vacuum, so the fact that the letter does not specify the consideration for that promise is not relevant. The question is whether, taken as a whole, the agreement contains the indicia of a contract.

The Carneal letter states: "the investors agree that the thrift will make no distribution of dividends until such time as a commitment with regard to the remaining $12.5 million capital infusion ... is secured and submitted to the satisfaction of the FSLIC." The integration clause of the Assistance Agreements integrates "any interpretation agreed to in writing by the parties." The Carneal language appears to show that the investors— that is, Mr. Fail—committed in writing to source the last $12.5 million of capital before paying dividends. This promise was made, in writing, on the day the transaction closed, by Mr. Fail's representative and chief negotiator. Moreover, this promise makes sense in terms of the entire transaction agreement, because the government, which pledged to invest $3 billion dollars as part of the deal, has an interest in insuring that Mr. Fail can deliver the capital infusion before taking money out of the new thrift. The Fail and Carneal letters, and particularly the pledge of plaintiffs to source the $12.5 million prior to any dividend distribution are part of the contract between the government, Bluebonnet, CFSB and Mr. Fail.

■ The question, then, is whether plaintiffs' failure to source the remaining $12.5 investment before requesting dividends can be excused. Pursuant to the Forbearance Letter, plaintiffs could not declare any dividend until one year after closing, or until December 22, 1989. However, Congress passed FIRREA in August 1989, prior to the earliest possible date at which plaintiffs could possibly have an obligation to source the last of their investment. Plaintiffs argue that the passage of FIRREA was an antecedent breach of their contract which excused their responsibility to source the $12.5 million before declaring and distributing dividends. Defendant argues that the passage of FIRREA is irrelevant to plaintiffs' obligations to source the capital infusion, and that this condition precedent was still extant notwithstanding the passage of FIRREA.

When the contract is looked at as a whole, it is impossible not to recognize that the passage of FIRREA fundamentally altered the nature of the transaction, and changed the premises under which Mr. Fail had made the deal. Plaintiffs agreed to take over and operate these failed thrifts, and provide $120 million in capital, in exchange for the government's cash infusion and the forbearances, which were designed to provide certain benefits to the plaintiffs. The dividend forbearance, it seems obvious, was present to ensure a source of cash flow for CFSB and Mr. Fail in order to cover the costs of financing the transaction going forward. As defendant acknowledges, FIRREA breached the Capital Plan contained in the forbearance. (It should be noted that defendant only concedes that this only breached a duty owed Bluebonnet, and not Mr. Fail and CFSB). The dividend forbearance, however, was tied directly to the targets set in the Capital Plan, so the passage of FIRREA effectively altered plaintiffs' right to declare dividends as well.

At the time the transaction was consummated, it was understood by both parties

that the final $50 million capital infusion was not yet due, and that, at least regarding the final installment due December 22, 1990, plaintiffs were planning on finding a partner to infuse the last $12.5 million of capital. This course of action, of course, was premised on enticing a partner based on the government's commitments. The passage of FIRREA, which breached the provisions of the Capital Plan, also breached the dividend promises premised on the now-breached Capital Plan. This occurred several months before the earliest possible date, December 22, 1989, when the investors would need to identify an investor for the remaining capital infusion.

According to the government's current litigation position, plaintiffs were still obligated to provide the identity of the last infusion of capital even though the government's own actions altered the underlying suppositions the parties had made in the contract that would enable plaintiffs to entice a partner to pledge that capital infusion. The government simply cannot hold plaintiffs to a condition precedent that was materially altered by its own breach. "Where a party's repudiation contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused." Restatement (2d) of Contracts § 255. In this instance, the evidence is clear that defendant's repudiation was material to plaintiffs' failure to identify the source of the remaining $12.5 million, thereby excusing plaintiffs' failure to meet the condition.[7]

The court therefore finds that the contract includes the Fail and Carneal letters, but that the passage of FIRREA effected a prior material breach which excused plaintiffs' obligation to identify the source of the $12.5 million infusion before declaring dividends.

## THE SUBORDINATED DEBT CLAIM

Defendant has moved to strike or dismiss with prejudice plaintiff's claim to count sub-ordinated debt as regulatory capital. Defendant offers two grounds: first, defendant contends that plaintiffs failed to properly plead the subordinated debt claim in their complaint pursuant to RCFC 15. Second, defendant contends, notwithstanding any Rule 15 pleading violation, that the subordinated debt claim is outside the scope of the claims permitted by the Settlement Agreement executed between plaintiffs and the FDIC in August 1995.

Defendant's first ground for dismissal is without merit. Defendant argues that plaintiffs complaint never mentions the subordinated debt claim. As part of the *Winstar*-related cases case management process, the government requested, and the court agreed, that defendant would not have to file an answer in this or any other *Winstar*-related case. RCFC 15(a) provides that "[a] party may amend the party's own pleadings once as a matter of course at any time before a response is served..." In light of unique procedural posture, and in light of the fact that defendant had notice of plaintiffs' allegation before it ever had to file a response in this litigation, the court believes the rather minimal requirements of notice pleading have been met.

■ Defendant's second ground—that the 1995 settlement precludes the subordinated debt claim—also is without merit. The Settlement Agreement's Mutual Release excepted from the settlement "all claims of CFSB and Fail to the extent they relate to alleged breaches of contract relating to capital forbearances, dividend forbearances, and dividend payments, or takings arising from any of the foregoing." As plaintiffs point out, "capital forbearances" is not defined in the Mutual Release, but plaintiffs recite several instances from the District Court litigation that show that plaintiffs believed that the capital forbearances encompassed the treatment of subordinated debt as capital. Defen-

---

**7.** Moreover, the government's initial denials of Bluebonnet's dividend requests were premised not on the failure to provide a source for the remaining capital, but on Bluebonnet's post-FIR-REA capital position in light of the heightened capital requirements. This is telling, because it suggests that the defendant, as plaintiff argues, did not consider the Carneal promise to be a material condition that needed to be met before dividends could be distributed. It strikes the court that this provision appears to have been belatedly invoked once it dawned on regulators that plaintiffs had a contract with the government governing required capital levels and dividend distributions.

dant only counters with the proposition that the government did not agree to forbear from taking action relating to subordinated debt, and hence the subordinated debt claim cannot be considered part of the "capital forbearance" claims excepted from the settlement. In light of the generic language of the Mutual Release, and given plaintiffs' contemporaneous understanding of the scope of capital forbearances, the court finds that the subordinated debt claim is not precluded by the 1995 Settlement Agreement.

## CONCLUSION

Upon full consideration of the plaintiffs' motion for partial summary judgment, and defendant's cross-motion for summary judgment, to dismiss and to strike, the supporting briefs, and the many, many ensuing briefs, and in accordance with this court's December 22, 1997 opinion in *California Federal Bank, et al. v. United States*, 39 Fed.Cl. 753 (1997), the following is hereby ORDERED:

1) Plaintiffs' motion for partial summary judgment as to liability is GRANTED;

2) Defendant's cross-motion for summary judgment, motion to dismiss plaintiffs James M. Fail and CFSB Corporation, and motion to strike or dismiss subordinated debt claims are denied.

Accordingly, it is hereby ORDERED and ADJUDGED that the following constituted binding contractual promises made by the FHLBB and the FSLIC to each of plaintiffs James M. Fail, CFSB Corporation (now Stone Capital) and Bluebonnet Savings Bank:

1) That portion of the December 22, 1988 Forbearance Letter, incorporated into the Bluebonnet Transaction Agreement, which permitted Bluebonnet to operate at the regulatory capital levels defined therein as the Capital Plan (hereinafter the Capital Plan Forbearance);

2) That portion of the December 22, 1988 Forbearance Letter, incorporated into the Transaction Agreement, which permitted the payment of dividends of up to 50 percent of all Bluebonnet annual net earnings after December 22, 1989, upon satisfaction of the Capital Plan (hereinafter the Dividend Forbearance);

3) FHLBB Resolution No. 88-1384P, as amended March 8, 1989, and incorporated into the Transaction Agreement, which qualified subordinated debt as part of Bluebonnet's regulatory capital (hereinafter the FHLBB Sub-Debt Resolution); and it is further

ORDERED and ADJUDGED that defendant, through FIRREA and its implementing regulations and related agency actions, breached the Capital Plan Forbearance, the Dividend Forbearance, and the FHLBB Sub-Debt Resolution, and that summary judgment on liability for breach of contract is entered in favor of plaintiffs and against defendant with respect to the Capital Plan Forbearance, the Dividend Forbearance, and the FHLBB Sub-Debt Resolution.

Lastly, it is ORDERED, pursuant to RCFC 77(f), the Omnibus Case Management Order (September 18, 1996) and the Priority Cases Pretrial Scheduling Order, (April 2, 1997), that this case be reassigned for all further proceedings, except for requests for clarification of this opinion, to Judge Bohdan A. Futey as Trial Judge.

**IT IS SO ORDERED.**