# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

JONATHAN URDAN and WILLIAM WOODWARD,

    Plaintiffs,

    v.

WR CAPITAL PARTNERS, LLC, a Delaware limited liability company, WR E3 HOLDINGS, LLC, a Delaware limited liability company, HENRI TALERMAN, FRANK E WALSH III, and BRADLEY D. KNYAL,

    Defendants,

    and

ENERGY EFFICIENT EQUITY, INC., a Delaware corporation,

    Nominal Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 2018-0343-JTL

## MEMORANDUM OPINION

Date Submitted: May 24, 2019
Date Decided: August 19, 2019

Elena C. Norman, Benjamin M. Potts, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Louis R. Miller, Daniel S. Miller, Jeffery B. White, MILLER BARONDESS, LLP, Los Angeles, California; *Counsel for Plaintiffs.*

Kenneth J. Nachbar, Alexandra M. Cumings, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; *Counsel for Defendants.*

**LASTER, V.C.**

A co-founder of a company and one of its early investors sued a private equity fund, its affiliates, and the two fund principals who served on the company's board of directors. The plaintiffs allege that after loaning the company funds and gaining representation on the board, the defendants used the rights they secured in the loan agreement to cut off the company's other financing options. Once the company was desperate for capital, the defendants extracted onerous terms that solidified the defendants' control. They then proceeded to dilute the plaintiffs through interested transactions.

The defendants moved to dismiss the complaint. They point out that after filing suit, the plaintiffs sold their shares. They contend that the plaintiffs thereby lost the ability to assert derivative claims. The same principle would foreclose the plaintiffs' ability to assert direct claims. The only remaining claims are for fraud and unjust enrichment, and the defendants contend that the complaint fails to plead the elements of these claims.

This decision agrees with the defendants. The motion to dismiss is granted.

## I.   FACTUAL BACKGROUND

The facts are drawn from the plaintiffs' complaint and the documents that are integral to the pleading. At this stage of the proceedings, the complaint's allegations are assumed to be true, and the plaintiffs receive the benefit of all reasonable inferences.

## A.    The Company

In 2014, plaintiff Jonathan Urdan and non-party Kevin Kurka co-founded Energy Efficient Equity, Inc. (the "Company"), which is a Delaware corporation operating in the property-assessed, clean-energy ("PACE") financing industry. In a PACE financing arrangement, a financial intermediary like the Company partners with a local municipality

to loan homeowners money for energy-saving improvements, and the homeowners repay the loans through additional tax assessments added to their property tax bills. The municipality authorizes the financial intermediary to assess the value of the improvements and collect the property taxes. The municipality also authorizes the financial intermediary to issue bonds backed by the property tax assessments. The financial intermediary uses proceeds from the bond issuances to fund the loans to homeowners.

The PACE financing industry is still young. California was the first state to approve PACE financing for home improvements in 2008, and although over thirty states have established PACE programs, almost all of the PACE volume is currently concentrated in California and Florida. In most states, PACE financing is also available for commercial properties, but this market largely remains untapped. As one of a limited number of firms operating in a high-potential industry, the Company had significant prospects for growth.

## B.    The Company's Initial Governance And Capital Structure

From the Company's founding until May 31, 2016, the members of the Company's board of directors (the "Board") were Urdan, Kurka, and plaintiff William Woodward, who was the Company's first outside investor. Urdan acted as president and CFO, and Kurka acted as CEO.

From the Company's founding until May 31, 2016, Urdan, Kurka, and Woodward owned 100% of the Company's equity. The following table summarizes the Company's capitalization as of May 30, 2016, with separate accounts for each person summed together.

| Stockholder | Common Stock | Series A Preferred | Convertible Debt | Fully Diluted |
|---|---|---|---|---|
| Kurka | 1,710,000 | 0 | 0 | 1,710,000 |
| Urdan | 1,710,000 | 80,000 | 170,000 | 1,960,000 |
| Woodward | 400,000 | 100,000 | 170,000 | 670,000 |
| **TOTAL** | **3,820,000** | **180,000** | **340,000** | **4,340,000** |

**C.      WR Capital And The 2016 Financing**

Defendant WR Capital Partners, LLC is a private equity fund based in Morristown, New Jersey. Defendants Henri Talerman and Frank E. Walsh III manage the fund, which invests in companies with valuations between $50 million and $500 million.

In early 2016, Talerman and Walsh approached Urdan, Kurka, and Woodward about investing in the Company. They touted their background and expertise in small-cap investing and stressed that they approached investing as a partnership with management. Walsh assured Urdan that if WR Capital invested in the Company, they would be "working together as partners." Compl. ¶ 51. The WR Capital website likewise represented that "[a]ll private investments are made in cooperation with management and directors of the portfolio company." Compl. ¶ 49.

With the assistance of counsel, the Company negotiated with WR Capital over the terms of a financing (the "2016 Financing"). On May 31, 2016, the 2016 Financing closed.

The centerpiece of the 2016 Financing was a loan agreement between the Company and WR E3 Holdings, LLC ("WR Sub"), a wholly owned subsidiary of WR Capital (the "Loan Agreement"). The Loan Agreement provided the Company with a revolving credit line of $5 million, which the Company could draw on in increments of at least $100,000. Drawn amounts would accrue interest at 10% per annum. As security for the loan, Urdan,

3

Kurka, and Woodward granted WR Capital a first priority security interest in all of their holdings of Company stock, both common and preferred.

Section 5 of the Loan Agreement, titled "Negative Covenants," identified fifteen categories of actions that the Company could not take without the prior written consent of WR Sub. The list included raising capital from outside investors and engaging in significant corporate transactions.

Section 7.1 of the Loan Agreement, titled "Events of Default," identified twelve events that would entitle WR Sub to declare outstanding draws on the credit facility immediately due and payable. The list included either Urdan or Kurka being terminated for cause, using that term as defined in their respective employment agreements.

As additional consideration for the Loan Agreement, the Company issued a warrant to WR Sub that authorized the purchase of up to 2,307,000 shares of Company common stock at $0.01 per share, exercisable in proportion to the level of draws on the credit facility. If fully exercised, the shares issued pursuant to the warrant would represent 31% of the Company's fully diluted equity. Section 1.2 of the Loan Agreement included an option for WR Sub to increase the size of the credit facility by up to $3 million, which WR Sub could exercise in its "sole discretion." If WR Sub elected to exercise this option, then the number of shares covered by the warrant would increase by 1% for each $1 million of additional credit. If WR Sub exercised the option in full, then it would receive the right to purchase an additional 379,034 shares. That would bring the total number of shares available under the warrant to 2,686,034 shares, representing 34% of the Company's fully diluted equity.

4

The plaintiffs allege that the term sheet for the 2016 Financing made clear that the 379,034 shares that WR Sub would receive if it exercised its option to provide another $3 million of capital established an upper bound on the amount of equity that WR Capital and its affiliates would receive for that amount of incremental financing. The plaintiffs allege that they negotiated this point because they did not want WR Capital to be able to take advantage of the Company if it required more capital.

As part of the 2016 Financing, the Company and WR Sub entered into a third agreement pursuant to which WR Sub paid $500,000 to acquire 301,979 shares of Series B Preferred Stock, reflecting a price of $1.65 per share. The Series B Preferred Stock was convertible into common stock.

As part of the 2016 Financing, the Board was expanded to five seats, and WR Sub received the right to appoint two members of the Board. WR Sub appointed Talerman and Walsh.

Also in May 2016, a wholly owned subsidiary of the Company borrowed $75 million from Oaktree Capital Management (respectively, the "Oaktree Loan" and "Oaktree"). The Oaktree Loan was secured by all of the assets of the Company, and Oaktree also received a pledge of all of the plaintiffs' stock and WR Sub's stock.

The following table summarizes the Company's capitalization after the 2016 Financing, assuming the Company drew all of $5 million authorized by the Loan Agreement, with separate accounts for each person summed together.

| Stockholder | Common Stock | Series A Pref. | Series B Pref. | Warrants | Convertible Debt | Fully Diluted |
|---|---|---|---|---|---|---|
| Kurka | 1,710,000 | 0 | 0 | 0 | 0 | 1,710,000 |
| Urdan | 1,710,000 | 132,199 | 0 | 0 | 170,000 | 2,012,199 |
| Woodward | 400,000 | 165,249 | 0 | 0 | 170,000 | 735,249 |
| WR Capital | 0 | 0 | 301,979 | 2,307,033 | 0 | 2,609,012 |
| Oaktree | 0 | 0 | 0 | 395,311 | 0 | 395,311 |
| TOTAL | 3,820,000 | 297,448 | 301,979 | 2,702,344 | 340,000 | 7,461,771 |

## D.    WR Capital Exercises Effective Control.

In early 2017, WR Capital issued "New Governance and Operating Procedures" that specified how Kurka, the Company's CEO, was to conduct business. Compl. ¶ 71. WR Capital refused to approve any additional draws under the Loan Agreement until Kurka signed the document and agreed to abide by it. In an email dated March 25, 2017, Walsh confirmed to Urdan that WR Capital would not approve draws until Kurka signed, stating: "Consistent with our discussions last week we will not consider funding this [credit draw] until [Kurka] signs the 'rules of the road' letter [Talerman] sent yesterday." *Id.* WR Capital did not have the right to impose this condition before funding a draw.

Effective April 23, 2017, WR Capital terminated Kurka's employment for cause. WR Capital took this action unilaterally, without any Board vote, and without having authority to do so.

As a result of his termination, Kurka lost his seat on the Board. His departure left the Board with just four members: Urdan, Woodward, Talerman, and Walsh. Because they represented half of the Board, WR Capital's two representatives could block the Board from taking action.

In May 2017, WR Capital hired defendant Bradley D. Knyal as CEO. The plaintiffs wanted to hire a new CEO with experience in technology or green energy financing and

had lined up a qualified candidate. WR Capital rejected the plaintiffs' candidate and hired Knyal because he was Walsh's golfing buddy, even though he had no experience in technology or green energy financing. WR Capital then negotiated the terms of Knyal's employment without input from the Board and installed him as CEO without complying with the Company's bylaws. As part of Knyal's compensation package, WR Capital caused the Company to grant Knyal equity representing 12% of the fully diluted shares. The plaintiffs' candidate, by contrast, was prepared to accept only a 2% equity stake. The plaintiffs allege that WR Capital gave Knyal a much larger stake to ensure his loyalty to WR Capital. According to the complaint, when Urdan objected to Knyal, Walsh screamed at him, "Brad Knyal is going to be CEO of [the Company], period, full stop." Compl. ¶ 74.

By June 2017, through these steps, WR Capital had established working control over the Company. Through the Loan Agreement, WR Capital controlled the Company's sole source of cash, and on at least one occasion, WR Capital had threatened to shut off access unless management did what WR Capital wanted. The negative covenants in the Loan Agreement enabled WR Capital to block the Company from accessing other sources of financing and gave WR Capital extensive veto rights over the Company's operations. With Kurka gone, WR Capital's representatives comprised one half of the Board, giving them the ability to block action at the board level. Through Knyal, WR Capital controlled the Company's day-to-day operations and management team.

WR Capital did not yet possess hard mathematical control at the stockholder level, falling just short even with Knyal's shares added to what WR Capital owned. But with the multiple levers of power that WR Capital had at its disposal, WR Capital wielded effective

control. Even in terms of representation on the Board, WR Capital's lack of an outright majority of the voting power mattered little, because its representatives served pursuant to contractual director-designation rights. Consequently, they could not be removed by the holders of a majority of the voting power.

**E.      WR Capital Manufactures A Financing Crisis.**

During 2017, WR Capital used its governance rights to block the Company from pursuing strategic alternatives. In early 2017, a prominent PACE financing company expressed interest in acquiring the Company for at least $15 million. After the two firms entered into a non-disclosure agreement and engaged in preliminary talks, WR Capital asserted that it would exercise its right under the Loan Agreement to block any transaction. WR Capital also turned down requests by Oaktree and the plaintiffs to raise financing from third-party investors.

By June 2017, the Company needed capital. Talerman played up the sense of urgency, telling the plaintiffs that the Company risked missing payroll and could have to file for bankruptcy. He told Urdan that the Company needed a new injection of capital to stay in business.

Under the terms of the 2016 Financing, WR Capital had the option to provide another $3 million in credit under the Loan Agreement in return for warrants to purchase 379,034 shares. Rather than exercising its option, WR Capital offered to provide the Company with an additional $3 million in revolving credit in return for warrants to purchase 8,524,478 shares (the "2017 Financing"). That amount of equity represented an increase of 2249% over the number of shares that WR Capital would have received for

exercising its option under the 2016 Financing. WR Capital also insisted on the right to fill three of the Company's five seats on the Board as part of the 2017 Financing.

In an email dated May 6, 2017, Walsh told the plaintiffs that the 2017 Financing was "by design expensive and not priced at 'arms length.'" Compl. ¶ 81. The financing valued the Company at approximately $4 million, even though a third-party acquirer had expressed interest just three months earlier in purchasing the Company for $15 million. Three months later, after solidifying its control, WR Capital would seek new financing at a proposed valuation of $30–$50 million, and one third-party investor would propose a valuation of $60 million.

The plaintiffs attempted to negotiate with WR Capital, but Walsh and Talerman refused to budge. Instead, Talerman threatened that if the plaintiffs did not accept WR Capital's terms, then WR Sub would declare an event of default based on Kurka's termination, accelerate the amounts due under the Loan Agreement, and exercise its rights as a secured creditor, which included the right to levy on all of the equity owned by the plaintiffs and Kurka.

With WR Capital having cut off all other financing alternatives, and facing the threat of the complete loss of their investment, the plaintiffs agreed to WR Capital's terms. The 2017 Financing closed in July 2017. The following table summarizes the Company's capitalization after the transaction, assuming the Company drew the full $8 million provided by WR Capital, with separate accounts belonging to each stockholder summed together. Unlike prior tables, this table includes shares in the employee pool. It lists options in the employee pool in the "Warrants" column.

9

| Stockholder | Common Stock | Series A Pref. | Series B Pref. | Warrants | Convert. Debt | Fully Diluted |
|---|---|---|---|---|---|---|
| Knyal | 2,312,000 | 0 | 0 | 0 | 0 | 2,312,000 |
| Urdan | 1,710,000 | 322,046 | 0 | 0 | 170,000 | 2,202,046 |
| Woodward | 400,000 | 402,557 | 0 | 0 | 170,000 | 972,557 |
| WR Capital | 0 | 0 | 301,979 | 11,831,511 | 0 | 12,133,490 |
| Oaktree | 0 | 0 | 0 | 395,311 | 0 | 395,314 |
| Employee Pool | 800,300 | 0 | 0 | 444,444 | 0 | 1,244,744 |
| **TOTAL** | **5,222,300** | **724,603** | **301,979** | **12,671,266** | **340,000** | **19,260,151** |

**F.      WR Capital Consolidates Control And Pursues Self-Interested Transactions.**

After securing mathematical control at the stockholder level and board level through the 2017 Financing, WR Capital fired the Company's longstanding outside counsel and hired a new firm. Then, on January 31, 2018, they notified Urdan that he was terminated from his positions with the Company, effective May 31, 2018.

In February 2018, WR Capital caused the Company to engage in an interested bridge financing (the "2018 Financing"). WR Capital sponsored the financing and gave Oaktree and Knyal the right to participate as co-sponsors. As consideration for providing the 2018 Financing, the sponsors received millions of additional shares. Through the 2018 Financing, the Company received an incremental credit facility of $2.5 million, with only $500,000 provided at closing.

Later in 2018, WR Capital and Knyal pursued an investment from a third party that would provide them with side benefits. WR Capital and Knyal also explored a sale of the Company that would provide them with side benefits. The complaint describes these events as the "Spring 2018 Capital Raise." The complaint does not allege that any transaction resulted from these efforts.

10

**G.     This Litigation**

In May 2018, the plaintiffs filed this lawsuit. The complaint asserted eight counts:

- Count I contends that WR Capital, WR Sub, Talerman, and Walsh owed fiduciary duties to the Company and its minority stockholders, which they breached by extracting the 2017 Financing and the 2018 Financing, by engaging in the events leading up to those transactions, and by pursuing the Spring 2018 Capital Raise.

- Count II contends that Knyal owed fiduciary duties to the Company and its stockholders, which he breached by extracting personal benefits from the 2018 Financing and by pursuing the Spring 2018 Capital Raise.

- Count III contends that Knyal aided and abetted WR Capital's breach of its fiduciary duties to the Company and its stockholders by helping WR Capital extract the 2017 Financing and the 2018 Financing as well as by pursuing the Spring 2018 Capital Raise.

- Count IV contends that WR Capital, WR Sub, Talerman, and Walsh fraudulently induced the plaintiffs to cause the Company to enter into the 2016 Financing.

- Count V contends that WR Capital, WR Sub, Talerman, and Walsh engaged in fraudulent concealment when they induced the plaintiffs to cause the Company to enter into the 2016 Financing.

- Count VI contends that WR Capital, WR Sub, Talerman, and Walsh breached the Loan Agreement from the 2016 Financing by extracting the right to acquire 2249% more shares in return for providing an additional $3 million in credit as part of the 2017 Financing.

- Count VII contends that WR Capital, WR Sub, Talerman, and Walsh were unjustly enriched by the 2017 Financing.

- Count VIII contends that WR Capital, WR Sub, Talerman, and Walsh breached the implied covenant of good faith and fair dealing that inhered in the Loan Agreement from the 2016 Financing by fabricating an Event of Default and then extracting the right to acquire 2249% more shares in return for providing an additional $3 million in credit as part of the 2017 Financing.

**H.     The Plaintiffs Sell Their Shares.**

In August 2018, while this action was pending, the Company completed a recapitalization with an unaffiliated investment fund, and the Company used the proceeds

to repurchase the plaintiffs' shares. As part of that transaction, the plaintiffs entered into a Settlement Agreement and Release dated August 31, 2018, with the defendants, Oaktree, the Company, and the third-party investor (the "Settlement Agreement"). The effectiveness of the Settlement Agreement was conditioned on the prior completion of the repurchases. Those antecedent transactions took place pursuant to two separate agreements, one between the Company and Urdan (the "Urdan Repurchase Agreement" or "URA"), and another between the Company and Woodward (the "Woodward Repurchase Agreement" or "WRA"; jointly, the "Repurchase Agreements").[1]

In accordance with the Urdan Repurchase Agreement, Urdan sold to the Company "all of [his] right, title, and interest in and to the Repurchased Securities, free and clear of any mortgage, pledge, lien, charge, security interest, claim, or other encumbrance." URA § 1.01. The agreement defined the "Repurchased Securities" as (i) 1,710,000 shares of Company common stock, (ii) 80,000 shares of Company Series A Preferred Stock, (iii) a convertible note with a face amount of $170,000, and (iv) any shares issuable upon conversion of the note or Series A Preferred Stock. *Id.* Ex. A. In return, Urdan received $1,128,916.03 plus interest due through closing on the note. *Id.* § 1.02.

In accordance with the Woodward Repurchase Agreement, Woodward sold to the Company "all of [his] right, title, and interest in and to the Repurchased Securities, free

---

[1] Woodward owned some of his securities through two entities. For simplicity, this decision ignores the distinction between Woodward and his entities, which is not relevant for purposes of its conclusions.

and clear of any mortgage, pledge, lien, charge, security interest, claim, or other encumbrance." WRA § 1.01. The agreement defined the "Repurchased Securities" as (i) 400,000 shares of Company common stock, (ii) 100,000 shares of Company Series A Preferred Stock, (iii) a convertible note with a face amount of $170,000, and (iv) any shares issuable upon conversion of the note or Series A Preferred Stock. *Id.* Ex. A. In return, Woodward received $656,390.02 plus interest due through closing on the note. *Id.* § 1.02.

Under the Settlement Agreement, the plaintiffs received additional consideration of $150,000 each. In return, the plaintiffs released all of their claims against Knyal and Oaktree. With exceptions not pertinent here, the plaintiffs also released their claims against the Company. As to WR Capital, WR Sub, Talerman, and Walsh, defined as the "WR Parties," the Settlement Agreement provided as follows:

> **<u>Preservation of Certain Claims, Defenses and Counterclaims</u>**. Nothing in this Agreement shall affect any claims any of the Delaware Plaintiffs may have against any of the WR Parties or the defenses or counterclaims that any of the WR Parties may have to the claims of the Delaware Plaintiffs.
>
> Nothing in the releases contemplated by this Agreement shall release any claims that any of the Delaware Plaintiffs has asserted or may assert against any of the WR Parties, whether derivative or otherwise;
>
> provided that, notwithstanding the foregoing, the WR Parties hereby waive and agree not to assert or otherwise raise any defense related to the Delaware Plaintiffs' agreement to sell their shares in the Company, including without limitation any defense that the Delaware Plaintiffs lack standing to assert any claim that has been brought or could have been brought in the Delaware Action.

Settlement Agreement ¶ 10 (formatting altered). The first two paragraphs of this provision carve out claims and defenses from the scope of the Settlement Agreement and the releases it contained. This decision refers to these two paragraphs as the "Release Carveout." In the

13

third paragraph, the provision attempts to prevent the defendants from relying on any of the legal consequences that might follow from the plaintiffs' selling their shares. This decision refers to the third paragraphs as the "Waiver Provision."

After entering into the Settlement Agreement, the plaintiffs dismissed their claims against Knyal. Counts II and III are therefore no longer part of the case.

## II. LEGAL ANALYSIS

The defendants have moved to dismiss the complaint under Rule 12(b)(6) for failing to state a claim on which relief can be granted. When considering a motion to dismiss for failure to state a claim, this court (i) accepts as true all well-pleaded factual allegations in the complaint, (ii) credits vague allegations if they give the opposing party notice of the claim, and (iii) draws all reasonable inferences in favor of the plaintiffs. *Central Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011). When applying this standard, dismissal is inappropriate "unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances." *Id.*

### A. The Effect Of The Stock Sales

The plaintiffs' decision to sell their shares had significant consequences for their ability to maintain derivative claims. Recognizing this fact, the plaintiffs argued at length about whether the sole remaining claim for breach of fiduciary duty in Count I was derivative or direct. During oral argument, I asked why the distinction mattered, given Delaware authority establishing that the right to maintain a direct claim for breach of fiduciary duty is a property right associated with the shares that passes to the buyer in a sale, such that by selling their shares, the plaintiffs divested their right to assert both types

14

of claims. The parties submitted supplemental briefing on this issue.

In the supplemental briefing, the plaintiffs contended that in the Settlement Agreement, they retained the right to assert both derivative and direct claims, effectively carving out that right from the bundle they otherwise sold. Unfortunately for the plaintiffs, the Repurchase Agreements clearly and unambiguous transferred all rights associated with the shares. Although the Release Carveout in the Settlement Agreement created an exception to the release of claims that the plaintiffs granted, it did not purport to exclude from the transfer of shares and retain for the plaintiffs any subset of rights associated with the shares. Nor could it, because the Release Carveout appeared in the Settlement Agreement, and the share transfers were governed by the Repurchase Agreements. The effectiveness of the Settlement Agreement was conditioned on the effectiveness of the sales pursuant to the Repurchase Agreements, which had already taken place in the conceptual microsecond before the Settlement Agreement became effective. Once the Repurchase Agreements became effective, the plaintiffs transferred all of their rights, including their ability to assert derivative and direct claims, regardless of what the Settlement Agreement might have contemplated.

In a different version of this argument, the plaintiffs say that the Release Carveout expressly preserved their claims. That argument fails because the Release Carveout only limited the scope of the releases in the Settlement Agreement. The Release Carveout did not address or limit the effect of the transactions governed by the Repurchase Agreements.

As their fallback argument, the plaintiffs cite the Waiver Provision and insist that the defendants cannot invoke any of the legal consequences resulting from the plaintiffs'

15

sale of the shares. The Waiver Provision appears in the Settlement Agreement, but its language is broad enough to encompass the transactions governed by the Repurchase Agreements. Nevertheless, on the facts of this case, the plaintiffs cannot rely on it to foreclose the legal effect of the transfers. Having sold all of their shares, they no longer have any interest in the derivative and direct claims that they want to continue litigating. The dispute has become non-justiciable, and any decision on the merits would be an impermissible advisory opinion.

### 1.  Derivative Claims

The right to sue derivatively is a property right associated with share ownership. When a share of stock is sold, the property rights associated with the shares pass to the buyer. 6 *Del. C.* § 8-302(a). Having transferred the property right that gives rise to the ability to sue derivatively, a plaintiff can no longer maintain a derivative action.

The development of two similarly sounding doctrines that both affect the ability of stockholders to bring derivative claims—the contemporaneous ownership requirement and the continuous ownership requirement—illustrates and confirms the settled nature of the rule that the right to sue derivatively passes to the buyer in a sale of shares. Generally speaking, a derivative claim is a cause of action belonging to a corporation that another party, typically a stockholder, seeks to litigate on the entity's behalf.[2] Although

---

[2] In limited circumstances, a creditor can assert derivative claims. *See N. Am. Catholic Educ. Programming Found. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007) ("[T]he creditors of an *insolvent* corporation have standing to maintain derivative claims . . . ."). In rarer circumstances, a director can assert derivative claims. *See Schoon v. Smith*, 953 A.2d

16

contemporary derivative actions most often involve stockholder plaintiffs attempting to assert claims for breach of fiduciary duty against corporate officers or directors, the biosphere of claims that can be pursued derivatively contains a multitude of species. "'Any claim belonging to the corporation may, in appropriate circumstances, be asserted in a derivative action,' including claims that do—and claims that do not—involve corporate mismanagement or breach of fiduciary duty."[3]

Derivative actions originally proliferated during the nineteenth century, not because of stockholders pursuing breach of fiduciary duty claims against management, but because management encouraged supportive stockholders to assert corporate claims against third-party defendants, frequently challenging taxes or other forms of regulation that a state or

---

196, 208 (Del. 2008) (en banc) (indicating that director could sue if necessary "to prevent a complete failure of justice on behalf of the corporation").

[3] 3 Stephen A. Radin, *The Business Judgment Rule* 3612 (6th ed. 2009) (quoting *Midland Food Servs., LLC v. Castle Hill Hldgs. V, LLC*, 792 A.2d 920, 931 (Del. Ch. 1999)); *accord* 1 R. Franklin Balotti & Jesse A. Finkelstein, *Delaware Law of Corporations & Business Organizations* § 13.10, at 13-24 (3d ed. 2019) (explaining that a derivative action can be used to assert any "corporate right that the corporation has refused for one reason or another to assert"); *see, e.g.*, *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1293 (Fed. Cir. 1999) (permitting "contract actions brought derivatively by shareholders on behalf of the contracting corporation"); *Slattery v. United States*, 35 Fed. Cl. 180, 183–84 (1996) (same); *Suess v. United States*, 33 Fed. Cl. 89, 93–94 (1995) (denying motion to dismiss a derivative claim for breach of contract against the United States); *see also Ross v. Bernhard*, 396 U.S. 531, 542 (1970) (holding right to jury trial existed for breach of contract claim asserted by stockholder derivatively because "[t]he corporation, had it sued on its own behalf, would have been entitled to a jury's determination").

17

municipality had imposed on the corporation's business.[4] Federal courts were perceived to be more hospitable to these claims, and to establish diversity jurisdiction, management would encourage a stockholder domiciled in a different state than the corporation, its directors, and the prospective defendant to assert the corporation's claim derivatively in federal court. *See* 7C Charles Alan Wright et al., *Federal Practice and Procedure* § 1830 (3d ed.), Westlaw (database updated Apr. 2019). The board would opt not to oppose the stockholder's pursuit of the litigation, enabling the case to proceed. *Id.* "If an accommodating stockholder could not be found, one could be created by transferring stock to an individual whose citizenship enabled that person to bring the suit." *Id.*; *accord* Dennis, *supra*, at 1486–1511. This technique worked precisely because the right to sue was an attribute of the shares that passed to the buyer along with ownership. *See* Robert C. Clark, *Corporate Law* § 15.4, at 651 (1986) (citing the practice of buying shares "in order to create diversity of citizenship and thereby gain access to the federal courts").

To prevent corporations from using this technique to manufacture diversity jurisdiction, the United States Supreme Court created the contemporaneous ownership requirement. *See Hawes v. Oakland*, 104 U.S. 450, 461 (1881) (subsequent history

---

[4] *See* Donna I. Dennis, *Contrivance and Collusion: The Corporate Origins of Shareholder Derivative Litigation in the United States*, 67 Rutgers U. L. Rev. 1479, 1486–1517 (2015); Bert S. Prunty, Jr., *The Shareholders' Derivative Suit: Notes on Its Derivation*, 32 N.Y.U. L. Rev. 980, 994 (1957); *see also* Edward J. Grenier, Jr., *Prorata Recovery by Shareholders on Corporate Causes of Action as a Means of Achieving Corporate Justice*, 19 Wash. & Lee L. Rev. 165, 166 (1962).

omitted). From that point on, for a stockholder to sue in federal court, the plaintiff had to have been a stockholder at the time of the wrong. *See id.*

The problem of corporations collusively manufacturing jurisdiction did not confront state courts, and the concept of a stockholder buying shares but not being able to exercise one of the rights associated with share ownership made little conceptual sense absent the need to address that overriding policy concern.[5] Consequently, a majority of states refused to adopt the contemporaneous ownership requirement, typically reasoning that the rule deprived the buyer of one of the rights associated with his shares.[6] Delaware stood with the

---

[5] Commentators across the centuries have criticized the illogic of the contemporaneous ownership requirement. *See* Clark, *supra*, § 15.4, at 651 (describing the rule as "difficult to justify"); 2 George D. Hornstein, *Corporation Law and Practice* § 712, at 195 (1959) (arguing that "[r]ejection of the contemporaneous ownership doctrine appears logically sound"); Henry Winthrop Ballantine, *Ballantine on Corporations* § 148, at 353 (rev. ed. 1946) (arguing against the contemporaneous ownership requirement because "[a] shareholder has an interest in all assets and all causes of action belonging to the corporation, whether they arose before or after he purchased his shares"); 1 Victor A. Morawetz, *The Law of Private Corporations* § 266, at 253–54 (2d ed. 1886) (finding "no good reason" for denying a buyer the right "to sue on account of causes of action which arose before he purchased his shares"). Although I respect that the General Assembly has imposed the contemporaneous ownership requirement by statute, *see infra*, and it therefore reflects the law of Delaware that I am bound to apply, my sympathies lie with the critics. *See generally* J. Travis Laster, *Goodbye to the Contemporaneous Ownership Requirement*, 33 Del. J. Corp. L. 673 (2008)

[6] *See* Ballantine, *supra*, § 148, at 352–53; Note, *Corporations—Uniform Stock Transfer Act—Effect on Minnesota Law—Negotiability of Shares—Right of Subsequent Transferee to Sue*, 23 Minn. L. Rev. 484, 488 n.30 (1939) (explaining that "a subsequent transferee of shares in a corporation should be able to maintain a derivative suit" and observing that "[t]his appears to be the majority position"); Note, *Stockholder's Suit for Wrong Which Occurred Before Complainant Acquired Stock*, 68 U.S. L. Rev. 169, 169 (1934) (noting that "[i]n most of the jurisdictions in which the question has been presented, it has been held that in the absence of special circumstances a stockholder's suit may be

majority and "did not follow the rule of the *Hawes* case." *Rosenthal v. Burry Biscuit Corp.*, 60 A.2d 106, 111 (Del. Ch. 1948).

It was not until 1945, seventy-four years after *Hawes*, that the General Assembly altered Delaware law by imposing the contemporaneous ownership requirement. The statute provides that "[i]n any derivative suit instituted by a stockholder of a corporation, it shall be averred in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which such stockholder complains or that such stockholder's stock thereafter devolved upon such stockholder by operation of law." 8 *Del. C.* § 327.

The enactment of Section 327 "effected a substantial change" in Delaware law. *Burry Biscuit*, 60 A.2d at 110. Before the statute, "in order to maintain a derivative action, a stockholder was not required to be the owner of the shares at the time of the transaction of which he complained." *Id.* (collecting cases). This was because the right to bring a derivative action passed to the buyer with the shares, and the buyer could assert that right. Since the adoption of Section 327, the right to sue continues to pass with the shares, but

---

brought by one who was not a stockholder at the time of the transaction of which he complains"); *see id.* at 172–75 (drawing on reasoning of cases to criticize contemporaneous ownership requirement); 6 Seymor D. Thompson & Joseph W. Thompson, *Commentaries on the Law of Corporations* § 4638, at 538 (3d ed. 1927) ("The general rule in the state courts undoubtedly is that the stockholder who pleads a good cause of action may maintain the same, although he was not an owner of the stock at the time the breach of duty was committed . . . ."). For a representative decision rejecting the imposition of a contemporaneous ownership requirement at common law, see *Pollitz v. Gould*, 94 N.E. 1088 (N.Y. 1911).

the buyer cannot assert that right. Both before and after the adoption of Section 327, the seller could no longer assert the derivative claim, precisely because she had sold her shares. *See Hutchinson v. Bernhard*, 220 A.2d 782, 783–84 (Del. Ch. 1965).

In 1984, the Delaware Supreme Court broadened the requirements for maintaining a derivative action by stating expansively that "a derivative shareholder must not only be a stockholder at the time of the alleged wrong and at [the] time of commencement of suit but that he must also maintain shareholder status throughout the litigation." *Lewis v. Anderson*, 477 A.2d 1040, 1046 (Del. 1984). Applying this rule after the closing of a reverse triangular merger in which the stockholder plaintiffs had their shares converted into shares of the acquiring company, the Delaware Supreme Court held that "a corporate merger destroys derivative standing of former shareholders of the merged corporation from instituting or pursuing derivative claims" that were the property of the acquired company. *Id.* at 1047. The high court later restated the rule as follows: "A plaintiff who ceases to be a shareholder, whether by reason of a merger or for any other reason, loses standing to continue a derivative suit." *Id.* at 1049.

The obligation of a derivative plaintiff to maintain stockholder status throughout the derivative action has been described as the "continuous ownership requirement." *Ark. Teacher Ret. Sys. v. Countrywide Fin. Corp.*, 75 A.3d 888, 894 (Del. 2013). Because of its capacious framing, the continuous ownership requirement has largely displaced the more specific, antecedent understanding that a stockholder's right to assert a derivative claim is a right associated with the shares that passes with the shares when sold. But the earlier and foundational proposition remains good law. Indeed, a close look at the citations in *Lewis*

*v. Anderson* suggests that the Delaware Supreme Court's broad formulation grew from an imprecise restatement of the antecedent rule. The transitional precedent appears to be *Heit v. Tenneco, Inc.*, where the court stated that "[u]nder Delaware law, a plaintiff, bringing a derivative suit on behalf of a corporation, must be a stockholder of the corporation at the time he commences the suit and must maintain that status throughout the course of the litigation." 319 F. Supp. 884, 886 (D. Del. 1970). For this proposition, the *Heit* decision cited *Hutchinson*, where Chancellor Seitz had agreed that the plaintiff lost standing because she voluntarily sold her shares to a third-party buyer and the right to sue passed with the shares. *Hutchinson*, 220 A.2d at 783–84. Subsequent decisions, including the trial court decision in *Lewis v. Anderson*, adopted the *Heit* court's reframing.[7] On appeal, the Delaware Supreme Court adopted and affirmed the trial court's statement of the law. *Lewis v. Anderson*, 477 A.2d at 1041, 1046.

In this case, the expansive continuous ownership requirement and the antecedent rule on the effect of selling shares lead to the same result: dismissal of the breach of fiduciary duty claim in Count I to the extent the claim is derivative. Although this decision

---

[7] There was an intervening decision (*Harff*) that followed *Heit. See Harff v. Kerkorian*, 324 A.2d 215, 219 (Del. Ch. 1974) ("But Delaware law seems clear that stockholder status at the time of the transaction being attacked and throughout the litigation is essential." (citing *Hutchison* and *Heit*)), *aff'd in part, rev'd in part on other grounds*, 347 A.2d 133 (Del. 1975). The trial court decision in *Lewis v. Anderson* followed *Harff. See Lewis v. Anderson*, 453 A.2d 474, 476 (Del. Ch. 1982) ("Stated as a general principle it is well established under Delaware law that a plaintiff bringing a derivative suit on behalf of a corporation must be a stockholder of the corporation at the time that he commences the suit and that he must maintain that status throughout the course of the litigation." (citing *Harff*, *Hutchison*, and *Heit*)) (subsequent history omitted).

22

could have simply cited *Lewis v. Anderson* for the continuous ownership requirement, the discussion of the antecedent rule provides helpful background for understanding why the same rule applies to direct claims.

Both doctrines also require dismissal of Counts VI and VIII, which are similarly derivative. In Count VI, the plaintiffs assert a claim for breach of the express provisions of the Loan Agreement. On the facts alleged in the complaint, that claim is derivative: The Company was a party to the Loan Agreement, and the plaintiffs seek to assert the Company's claim on its behalf. Having sold their shares, they can no longer assert that claim.

The same is true for Count VIII, where the plaintiffs assert a claim for breach of the implied covenant of good faith and fair dealing that inheres in the Loan Agreement. Although that claim relies on implied terms rather than express provisions, it is a claim for breach of the Loan Agreement. That is a right held by the Company, which the plaintiffs seek to assert derivatively. Having sold their shares, they can no longer assert that claim either.

### 2. Direct Claims

Both during the initial briefing and in the supplemental briefing, the parties debated whether, by transferring their shares, the plaintiffs lost their ability to assert direct claims. The parties' discussion of this issue explored the ever-fertile fields of the derivative-versus-direct distinction. If the plaintiffs had been deprived of their shares by merger, then that distinction would matter, because the plaintiffs could challenge the transaction that deprived them involuntarily of their property rights. But in this case, the plaintiffs sold their

shares voluntarily. By selling their shares, the plaintiffs transferred the rights to sue that depended on ownership of their shares.

Like the right to assert a derivative claim, the right to assert a direct claim is a property right associated with the shares. *In re Sunstates Corp. S'holder Litig.*, 2001 WL 432447, at *3 (Del. Ch. Apr. 18, 2001). Consequently, unless the seller and buyer agree otherwise, the ability to assert a direct claim and the ability to benefit from any remedy pass with the shares.[8] If a seller wishes to retain a subset of the rights associated with the transferred shares, such as the right to assert a direct claim, then the parties to the transaction must provide specifically for that outcome.[9] Otherwise, when the shares are

---

[8] *See In re Prodigy Commc'ns Corp. S'holders Litig.*, 2002 WL 1767543, at *4 (Del. Ch. July 26, 2002) ("[W]hen Beoshanz sold his shares in the marketplace, the claim relating to the fairness of the then-proposed transaction passed to his purchaser, who enjoyed the benefits of the settlement."); *In re Triarc Cos., Inc. Class & Deriv. Litig.*, 791 A.2d 872, 878–79 (Del. Ch. 2001) (explaining owners of stock who sell their shares are "viewed as having sold their interest in the claim with their shares"); *see also Sunstates*, 2001 WL 432447, at *3 ("I can see little reason why the claim for breach of the preferred stock charter provisions would not ordinarily transfer with the shares.").

[9] The converse proposition is also true: If a seller wishes to transfer only certain rights associated with the shares, such as the right to assert a direct claim, then the parties must contract for that result. *See In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745, at *29 (Del. Ch. May 3, 2004, revised June 4, 2004) (permitting the assertion of breach of fiduciary duty claims transferred separately from the underlying shares); *see also Puma v. Marriott*, 294 F. Supp. 1116, 1119 (D. Del. 1969) (holding that claim for breach of fiduciary duty is assignable under 10 *Del. C.* § 3701).

24

sold, the rights to assert and benefit from direct claims pass with the shares to the new owner.[10]

The concept of a right to enforce a cause of action associated with the ownership of property passing to the buyer when the property is sold is not something unique to shares. The owner of a debt instrument can enforce the right to receive payments of principal and interest, plus any other rights granted to the owner by the instrument, but transfers those rights to a subsequent holder through a sale or assignment of the instrument.[11] The owner

---

[10] *See Prodigy*, 2002 WL 1767543, at \*4; *Sunstates*, 2001 WL 432447, at \*3; *Triarc*, 791 A.2d at 878–79. The obligations arising from stockholder status likewise transfer to the new owner. *See Webster v. Upton*, 91 U.S. 65, 70 (1875) ("[I]t would be absurd to say, upon general reasoning, that, if the original subscribers have the power of assigning their shares, they should, after disposing of them, be liable to the burdens which are thrown upon the owners of the stock.").

There are references in two decisions that cloud the issue of whether direct claims for breach of fiduciary duty pass with the shares or should be regarded as personal claims that remain with the seller. *See Schultz v. Ginsburg*, 965 A.2d 661, 667 n.12, 668 (Del. 2009); *In re Celera Corp. S'holder Litig.*, 2012 WL 1020471, at \*14 (Del. Ch. Mar. 23, 2012), *aff'd in part, rev'd in part on other grounds*, 59 A.3d 418 (Del. 2012). Having elsewhere explained why I believe it would run contrary to the weight of Delaware law to interpret these comments to mean that direct claims for breach of fiduciary duty are actually personal claims that remain with the sellers, I will forego repeating that discussion here. *See In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1055 (Del. Ch. 2015).

[11] This result flows from the general doctrine of privity of contract. *Privity of Contract*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("The relationship between the parties to a contract, allowing them to sue each other but preventing a third party from doing so."). Under this doctrine, once a party assigns its rights under the contract, it no longer is in privity with the other parties and cannot enforce the contractual rights against them. *See* 17A AM. JUR. 2D *Contracts* § 405, Westlaw (database updated Aug. 2019) ("The doctrine of privity of contract requires that only parties to a contract may bring suit to enforce it. Privity of contract is essential and a necessary predicate to a suit on a contract." (footnotes omitted)); 17B C.J.S. *Contracts* § 836, Westlaw (database updated June 2019)

of real property likewise holds a bundle of rights derived from ownership, but transfers those rights and the ability to enforce them when the property is sold.[12] So too with a tenant under a lease.[13] "No mode of terminating an equitable interest can be more perfect than a voluntary relinquishment . . . of all rights under the contract, and a voluntary surrender of the possession . . . ." *Jennisons v. Leonard*, 88 U.S. 302, 310 (1874).

_____

("As a general rule only the parties and privies to a contract may enforce it. A party to a contract who has not parted with his or her interest in the contract may sue on the contract. Only a person who is a party or in privity may sue on the contract as a direct proceeding in equity." (footnotes omitted)). There are, of course, many exceptions to the doctrine of privity of contract that are implicated by more complex factual scenarios, but they do not apply to a plain-vanilla assignment like the one in this case. *See, e.g.*, 17B C.J.S. *Contracts* § 836, Westlaw (database updated June 2019) (identifying exceptions).

[12] The force of the transfer principle is so strong that when there is a delay between signing and closing, equity treats the rights associated with ownership as having been transferred to the purchaser at signing. *See, e.g.*, *Lawyers Title Ins. Corp. v. Wolhar & Gill, P.A.*, 575 A.2d 1148, 1153 n.2 (Del. 1990) ("It is settled law in Delaware (and in those other jurisdictions which recognize the doctrine [of equitable conversion]) that the execution of a contract for the sale of real property effectively transfers the seller's *equitable* interest in the land to the purchaser, and thereafter the seller merely retains a *legal* interest in the proceeds of the sale.").

[13] This result flows from the general doctrine of privity of estate. *See Privity of Estate*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("A mutual or successive relationship to the same right in property, as between grantor and grantee or landlord and tenant."); 49 AM. JUR. 2D *Landlord & Tenant* § 916, Westlaw (database updated Aug. 2019) ("A lessee who assigns the lease divests itself of the privity of estate, although not of the privity of contract. The assignment thus divests the lessee of any interest in the property and transfers it to the assignee . . . ." (footnotes omitted)); 52 C.J.S. *Landlord & Tenant* § 50, Westlaw (database updated June 2019) ("Upon an assignment by the lessee, the privity of estate between the lessee and lessor is destroyed, and a new privity of estate is created between the assignee and the lessor."). As with the doctrine of privity of contract, there are exceptions to the doctrine of privity of estate, but the basic principle is illustrative. *See, e.g.*, 49 AM. JUR. 2D *Landlord & Tenant* § 922, Westlaw (database updated August 2019) (identifying exceptions).

In this case, Count I of the complaint asserted a claim for breach of fiduciary duty that the plaintiffs characterized as direct and the defendants as derivative. There is no need to parse the derivative-versus-direct distinction because, assuming for the sake of argument that the claim was direct, the plaintiffs lost their ability to assert it when they voluntarily sold their shares. The right to assert Count I, like the right to assert the other rights associated with the shares, passed to the buyer. Unless the plaintiffs somehow contracted to retain those rights, they lost their ability to sue.

### 3. The Release Carveout

To escape the implications of selling their shares, the plaintiffs argue that they retained the right to assert the claims in this case when they sold their shares. They stitch together a series of provisions in the Repurchase Agreements and the Settlement Agreement. Although there are two Repurchase Agreements, they operate in parallel and are substantively identical for purposes of the provisions discussed in this section. For simplicity, therefore, this decision refers to a singular Repurchase Agreement and only cites the Urdan Repurchase Agreement. The same analysis applies to the Woodward Repurchase Agreement.

To argue that they retained the right to sue when they sold their shares, the plaintiffs start with Section 1.01 of the Repurchase Agreement, which states:

> **Purchase and Sale.** Subject to the terms and conditions set forth herein, at the Closing (as defined herein), Seller shall sell to the Company, and the Company shall purchase from Seller, all of Seller's right, title, and interest in and to the Repurchased Securities, free and clear of any mortgage, pledge, lien, charge, security interest, claim, or other encumbrance ("**Encumbrance**"), for the consideration specified in <u>Section 1.02</u>.

Stressing the language "[s]ubject to the terms and conditions set forth herein," the plaintiffs say that the Repurchase Agreement incorporated the Settlement Agreement by reference, making the Settlement Agreement part of the "terms and conditions set forth herein." Because the Release Carveout was a term of the Settlement Agreement, the plaintiffs contend that the transfer of their shares was subject to the Release Carveout. The plaintiffs then rely on the Release Carveout as purportedly excluding their claims from the universe of rights that the plaintiffs transferred.

This argument has two critical steps. First, the Repurchase Agreement must incorporate and be subject to the Settlement Agreement. Second, the Release Carveout must withhold litigation rights that the Repurchase Agreement otherwise would have transferred. Neither step withstands close examination.

The first step in the argument fails because the Repurchase Agreement did not incorporate the Settlement Agreement by reference. To support their contrary assertion, the plaintiffs cite the first page of the Repurchase Agreement, where the recitals state:

> WHEREAS, concurrently herewith, Seller is entering into a Settlement Agreement and Release (the "**Settlement Agreement**") with [the other parties to the Settlement Agreement] pursuant to which, among other things, the parties thereto are releasing certain claims against each other.

Although the recitals mention the Settlement Agreement, they do not incorporate it by reference. Moreover, recitals are not substantive provisions of an agreement: "Generally, recitals are not a necessary part of a contract and can only be used to explain some apparent doubt with respect to the intended meaning of the operative or granting part of the instrument. If the recitals are inconsistent with the operative or granting part, the latter

28

controls."[14]

There is a clause in the Repurchase Agreement that addresses its relationship to the Settlement Agreement, but it cuts against the plaintiffs' argument. Section 8.06 of the Repurchase Agreement contains an integration clause, which states:

> This Agreement, the Settlement Agreement, the [other Repurchase] Agreement and the documents to be delivered hereunder and thereunder constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein . . . . In the event of any inconsistency between the terms and provisions in the body of this Agreement and those in the documents delivered in connection herewith, the terms and provisions in the body of this Agreement shall control.

Notably, the integration clauses provides that "[i]n the event of any inconsistency" between the Repurchase Agreement and the Settlement Agreement, "the terms and provisions in the body of [the Repurchase] Agreement shall control." The plaintiffs' contention that the Settlement Agreement withheld litigation rights associated with the shares conflicts with

---

[14] *New Castle Cty. v. Crescenzo*, 1985 WL 21130, at *3 (Del. Ch. Feb. 11, 1985) (citation omitted); *accord Llamas v. Titus*, 2019 WL 2505374, at *16 (Del. Ch. June 18, 2019); *Glidepath Ltd. v. Beumer Corp.*, 2019 WL 855660, at *16 (Del. Ch. Feb. 21, 2019); *Creel v. Ecolab, Inc.*, 2018 WL 5778130, at *4 (Del. Ch. Oct. 31, 2018); *UtiliSave, LLC v. Miele*, 2015 WL 5458960, at *7 (Del. Ch. Sept. 17, 2015); *see* 17A AM. JUR. 2D *Contracts* § 373, Westlaw (database updated May 2019) ("'Whereas clauses' are generally viewed as being merely introductory and since recitals indicate only the background of a contract, that is, the purposes and motives of the parties, they do not ordinarily form any part of the real agreement." (footnote omitted)); *see also United States v. Cmty. Health Sys., Inc.*, 666 Fed. App'x 410, 417 (6th Cir. 2016) (holding that a recital "does not itself create a binding obligation" but nevertheless "may guide interpretation of the binding obligation in [a substantive provision], but only if [the substantive provision] is ambiguous in the first place"); *Simpson v. City of Topeka*, 383 P.3d 165, 178 (Kan. Ct. App. 2016) ("[A] court cannot rely on a general statement of contractual purpose to alter the plain meaning of the operative terms of a particular substantive provision of the agreement." (collecting authorities)).

the all-encompassing transfer of rights contemplated by the Repurchase Agreement, discussed next. To the extent the plaintiffs were reading the Settlement Agreement correctly, a conflict would exist, and the provisions of the Repurchase Agreement would control. The emphasis on terms and provisions "in the body of" the Repurchase Agreement provides another reason to reject the plaintiffs' arguments that are based on the recitals.

The second step in the plaintiffs' argument is no more successful. The Release Carveout did not withhold any claims from the scope of the sale. Its function was to carve out claims against the WR Parties from the broad releases that the plaintiffs granted in favor of the other parties to the Settlement Agreement. The Release Carveout addressed the releases. It did not address the scope of the rights that the plaintiffs transferred when they sold their shares pursuant to the Repurchase Agreement.

For purposes of analyzing this aspect of the plaintiffs' argument, two sentences in the Release Carveout are relevant. The first states: "Nothing in this Agreement shall affect any claims any of the Delaware Plaintiffs may have against any of the WR Parties or the defenses or counterclaims that any of the WR Parties may have to the claims of the Delaware Plaintiffs." For purposes of this provision, the term "this Agreement" means the Settlement Agreement. The plain language of this provision confirms that nothing in the Settlement Agreement affected "any claims any of the Delaware Plaintiffs may have against any of the WR Parties." And that is true. The plaintiffs did not lose their ability to assert claims as a result of anything in the Settlement Agreement. The plaintiffs lost their ability to assert claims as a result of selling their shares pursuant to the Repurchase Agreements.

30

The second sentence in the Release Carveout has a more targeted scope and effect. It says: "Nothing in the releases contemplated by this Agreement shall release any claims that any of the Delaware Plaintiffs has asserted or may assert against any of the WR Parties, whether derivative or otherwise." The plain language of this provision confirms that nothing in the "releases contemplated by this [Settlement] Agreement" released any of the plaintiffs' claims against the WR Parties. And that too is true. The plaintiffs did not give up their claims in the releases in the Settlement Agreement. They gave up their claims by selling their shares pursuant to the Repurchase Agreements.

Elsewhere, the language of the Settlement Agreement makes clear that the parties understood that the plaintiffs were selling all of their shares pursuant to the Repurchase Agreements. Most notably, Section 2 of the Settlement Agreement recited that the plaintiffs were selling "all" of their equity interests in the Company as a condition precedent to the Settlement Agreement. It states:

> **Sale of Delaware Plaintiffs' Interests in the Company**. As conditions to this Agreement, (i) Jonathan Urdan shall sell to the Company all of his interests in common stock of the Company and Series A Preferred Stock of the Company and all of his interests in a 1.5% Convertible Promissory Note issued by the Company (including all shares of common stock issuable upon conversion thereof) pursuant to the Urdan Repurchase Agreement and (ii) the Woodward Parties shall sell to the Company all of their interests in common stock of the Company and Series A Preferred Stock of the Company and all of William Woodward's interests in a 1.5% Convertible Promissory Note issued by the Company (including all shares of common stock issuable upon conversion thereof) pursuant to the Woodward Repurchase Agreement.

The Settlement Agreement thus recognized that as a condition to the effectiveness of the Settlement Agreement, the plaintiffs had sold "all" of their shares to the Company. Consistent with this understanding, Section 1.01 of the Repurchase Agreement stated that

31

the seller agreed to sell, and the Company agreed to purchase, "all of Seller's right, title, and interest in and to the Repurchased Securities." Nothing was carved out. And in Section 3.4 of the Repurchase Agreement, the seller represented that "[t]he Repurchased Securities constitute all of the outstanding equity interests in the Company and its subsidiaries owned by Seller and its Affiliates." Once again, nothing was carved out.

The recitals in the Settlement Agreement and the Repurchase Agreement reflect the same understanding. Although the recitals are not substantive provisions, they provide background and can offer insight into the intent of the parties. *See TA Operating LLC v. Comdata, Inc.*, 2017 WL 3981138, at *23 (Del. Ch. Sept. 11, 2017).

- A recital in the Settlement Agreement stated: "WHEREAS, as part of the resolution of claims against certain of the parties, the Delaware Plaintiffs will sell their interests in the Company back to the Company on terms set forth in separate Repurchase Agreements . . . ."

- A recital in the Repurchase Agreement described each seller as "the owner of, or has the right to acquire, the securities of the Company identified on Exhibit A (the '**Repurchased Securities**')." Neither Exhibit A nor this definition carved rights out of the scope of the Repurchased Securities.

- Another recital in the Repurchase Agreement stated that "the Company wishes . . . to purchase the Repurchased Securities, subject to the terms and conditions set forth herein." Again, no rights were carved out of the scope of the Repurchased Securities.

In this case, the recitals confirm that the plaintiffs sold all of their shares and did not exclude any rights from the sale.

Section 1 of the Settlement Agreement conditioned the closing of the Settlement Agreement on the closing of the stock sales. The same provision stated that Sections 3 through 11 of the Settlement Agreement, which included the releases and the Release

32

Carveout, "shall be effective upon the closings under the Repurchase Agreements." Consequently, the Release Carveout did not become effective until the conceptual microsecond *after* the share transfers were complete. At that point, the Company owned the shares, and the Release Carevout could not modify the completed aspect of the transaction.

When the plaintiffs sold their shares pursuant to the Repurchase Agreement, they sold all of the Repurchased Securities, including all of the rights associated with them. They did not hold anything back. At best for the plaintiffs, the Release Carveout is inconsistent with the transfer of all "right, title, and interest in and to" their shares pursuant to Section 1.01 of the Repurchase Agreement, but in that event, under the integration clause, the terms of the Repurchase Agreement control.

In theory, the plaintiffs could have contracted not to sell all of the Repurchased Securities and to retain certain rights associated with their shares. *See, e.g.*, 6 *Del. C.* § 8-302(b). But they did not do that. They sold all of their shares, and their right to assert direct and derivative claims passed to the buyer.

### 4. The Waiver Provision

The plaintiffs finally argue that even if the Repurchase Agreements had the effect that the law requires, the defendants could not reveal that fact to the court. In support of this proposition, they cite the Waiver Provision, which states:

> [N]otwithstanding the foregoing, the WR Parties hereby waive and agree not to assert or otherwise raise any defense related to the Delaware Plaintiffs' agreement to sell their shares in the Company, including without limitation any defense that the Delaware Plaintiffs lack standing to assert any claim that has been brought or could have been brought in the Delaware Action.

33

If enforced on the facts of this case, the Waiver Provision would result in the plaintiffs pursuing claims from which they could not benefit, resulting in the Delaware courts issuing advisory opinions that will help no one.

"The concept of standing, in its procedural sense, refers to the right of a party to invoke the jurisdiction of a court to enforce a claim or redress a grievance." *Schoon v. Smith*, 953 A.2d 196, 200 (Del. 2008) (en banc) (quoting *Stuart Kingston, Inc. v. Robinson*, 596 A.2d 1378, 1382 (Del. 1991)) (internal quotation marks omitted). "Accordingly, '[a]s a preliminary matter, a party must have standing to sue in order to invoke the jurisdiction of a Delaware court.'" *El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1256 (Del. 2016) (quoting *Ala. By-Prods. Corp. v. Cede & Co.*, 657 A.2d 254, 264 (Del. 1995)). Questions of standing must be addressed to "ensure that the litigation before the tribunal is a 'case or controversy' that is appropriate for the exercise of the court's judicial powers." *Dover Historical Soc'y v. City of Dover Planning Comm'n*, 838 A.2d 1103, 1110 (Del. 2003). In ruling on the implications of the continuous ownership rule for purposes of standing, the Delaware Supreme Court held that "the question of derivative standing is properly a threshold question that the [c]ourt may not avoid." *El Paso*, 152 A.3d at 1257 (internal quotation marks omitted; alteration in original). "Once standing is lost, the court lacks the power to adjudicate the matter . . . ." *Id.* at 1256. If a court lacks the power to hear a dispute, then parties cannot bestow jurisdiction on the court by agreement or through

related doctrines like estoppel or waiver.[15]

Based on these Delaware Supreme Court precedents, it appears that, at least for purposes of derivative standing, the question of whether the plaintiffs lost standing to maintain their claims by selling their shares is a jurisdictional issue that cannot be avoided. As to the derivative claims at a minimum, the Waiver Provision could not prevent the defendants from mentioning the Repurchase Agreements and their implications for justiciability. To do otherwise would permit the parties to establish jurisdiction by agreement, which is contrary to law. Arguably, an agreement to this effect would permit the parties to maintain a fraud on the court, in which limited judicial resources would be devoted to overseeing a non-justiciable case.

At least for purposes of the derivative claims, the Waiver Provision cannot insulate the plaintiffs from the consequences of their actions. On the facts of this case, the plaintiffs voluntarily chose to divest themselves of their shares. By doing so, they gave up any basis on which to claim that they could maintain derivative claims on behalf of the Company. They also gave up any basis on which to receive the benefit of any recovery, because the recovery would flow to the Company, and the plaintiffs no longer had any interest in the Company. By transferring all of their shares, they transformed themselves into "empty plaintiff[s]," pursuing claims that at most would result in an impermissible advisory

---

[15] *See Thompson v. Lynch*, 990 A.2d 432, 434 (Del. 2010); *Sternberg v. O'Neil*, 550 A.2d 1105, 1109 (Del. 1988) (subsequent history omitted); *Bruce E.M. v. Dorothea A.M.*, 455 A.2d 866, 871 (Del. 1983).

opinion. *Parfi Hldg. AB v. Mirror Image Internet, Inc.*, 954 A.2d 911, 940 (Del. Ch. 2008) (internal quotation marks omitted).

The same policies prevent the plaintiffs from relying on the Waiver Provision as a basis for maintaining a direct claim. Once they transferred their shares, the plaintiffs were no longer beneficiaries of the fiduciary duties that they sought to invoke, and they would not receive the benefit of any recovery, which would go to the then-current owners of the shares. Having transferred their shares, the plaintiffs no longer had any interest in the dispute.

There are decisions in which this court has declined to enforce the full consequences of a plaintiff's decision to sell its shares. In one instance, a named plaintiff in a derivative action sold its shares, but the court permitted the law firm who represented that plaintiff to continue as part of the committee of the whole, recognizing that there were other plaintiffs who had standing to sue. *See In re New Valley Corp. Deriv. Litig.*, 2004 WL 1700530, at *6–7 (Del. Ch. June 28, 2004). In another instance, this court approved a class action settlement during the pre-*Trulia* era, even though the named plaintiffs had sold their shares. *See In re Celera Corp. S'holder Litig.*, 2012 WL 1020471, at *1–2 (Del. Ch. Mar. 23, 2012), *aff'd in part, rev'd in part*, 59 A.3d 418 (Del. 2012). Both rulings appear to be pragmatic decisions that reflect the counsel-driven nature of representative litigation and the ability of lead counsel to substitute a new stockholder plaintiff. Other decisions have discussed the concept of waiver and found that the facts did not support its potential application to the case, avoiding the need to address the more difficult question of justiciability. *See, e.g.*, *Weingarten v. Monster Worldwide, Inc.*, 2017 WL 752179, at *3

(Del. Ch. Feb. 27, 2017); *In re First Interstate Bancorp Consol. S'holder Litig.*, 729 A.2d 851, 859–60 (Del. Ch. 1998). These cases do not imply that the Waiver Provision will force the defendants to litigate, and the Delaware courts to adjudicate, the plaintiffs' claims.

After their voluntary decision to sell their shares, the plaintiffs lacked any legally cognizable interest in claims that relied on rights associated with the shares they had transferred. Allowing a party to litigate a claim that it has no real interest in is contrary to Delaware law. The plaintiffs cannot rely on the Waiver Provision to convert non-justiciable claims into justiciable ones.

## B. The Fraud Claims

In Counts IV and V of the complaint, the plaintiffs have asserted claims for fraud. In both counts, the plaintiffs assert that WR Capital, WR Sub, Talerman, and Walsh fraudulently induced them to enter into the 2016 Financing. In Count IV, they assert that the defendants accomplished this through fraudulent representations. In Count V, they say that the defendants accomplished this through fraudulent concealment. In their answering brief, the plaintiffs claimed that the fraudulent concealment actually occurred in connection with the 2017 Financing and the Spring 2018 Capital Raise. These claims fail on the merits.[16]

---

[16] The plaintiffs' transfer of their shares pursuant to the Repurchase Agreements had no effect on their fraud claims, which were personal claims belonging to the plaintiffs. One of the "[q]uintessential examples" of a personal claim is "a tort claim for fraud in connection with the purchase or sale of shares." *Citigroup Inc. v. AWH Inv. P'ship*, 140 A.3d 1125, 1140 n.76 (Del. 2016) (quoting *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1056 (Del. Ch. 2015)). The cause of action arises out of the information

To state a claim for fraud, a complaint must plead the following elements:

1) a false representation, usually one of fact, made by the defendant;

2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth;

3) an intent to induce the plaintiff to act or to refrain from acting;

4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and

5) damage to the plaintiff as a result of such reliance.

*Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983). The first element can also be satisfied if a defendant deliberately conceals a material fact or remains silent about a material fact in the face of a duty to speak. *Id.*; *accord Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149 (Del. 1987).

"[T]he circumstances constituting fraud" must be pled "with particularity." Ct. Ch. R. 9(b). Pertinent circumstances include "(1) the time, place, and contents of the [fraud]; (2) the identity of the person [committing fraud]; and (3) what the person intended to gain . . . ." *ABRY P'rs V, L.P. v. F&W Acq., LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006). The allegations need not resemble a written transcript. Rather, the complaint must provide "detail sufficient to apprise the defendant of the basis for the claim." *Id.* "Malice, intent,

---

that was provided or not provided in connection with the sale. It is not a right associated with the underlying shares. *See Activision*, 124 A.3d at 1056. As a result, the right to assert or benefit from the claim is not attached to and does not accompany the sale of the underlying shares. The claim belongs to and remains with the person who was defrauded.

knowledge and other condition of mind of a person may be averred generally." Ct. Ch. R. 9(b).

### 1. Overt Misrepresentations

The plaintiffs attempt to plead fraud based on two instances of overt misrepresentations in connection with the 2016 Financing. Neither provides the necessary predicate for a fraud claim.

The first set of overt misrepresentations related to the parties' relationship. The plaintiffs contend that the defendants induced them to enter into the 2016 Financing by falsely stating in an early 2016 email that the defendants and plaintiffs would be "working together as partners." Compl. ¶ 51. In addition, the plaintiffs allege that the same email falsely represented that WR Capital only sought "minority" ownership. *Id.* The plaintiffs say that the defendants reinforced these representations in other ways, such as through the WR Capital website, where the defendants held themselves out as making investments "in cooperation with management and directors." Compl. ¶ 49. According to the plaintiffs, the defendants actually intended to obtain control of the Company and to dilute and replace its management team.

Along similar lines, the plaintiffs allege that the defendants touted their ability to raise capital for the Company from outside sources if they were given a seat at the table. Compl. ¶¶ 5, 50. According to the plaintiffs, the defendants in fact planned to use their blocking rights to deprive the Company of access to outside capital so that the Company would be forced to accept onerous and unfair terms from the defendants.

Statements like this are puffery, and a plaintiff cannot reasonably rely on them for purposes of a fraud claim. *See Airborne Health, Inc. v. Squid Soap, LP*, 2010 WL 2836391, at \*4, \*8 (Del. Ch. July 20, 2010); *Solow v. Aspect Res., LLC*, 2004 WL 2694916, at \*3 (Del. Ch. Oct. 19, 2004). Perhaps the plaintiffs in fact relied on these statements. Academic literature supports the importance of trust between entrepreneurs and investors,[17] making it conceivable that a deceitful party could induce detrimental reliance by falsely signaling trustworthiness. But for purposes of a fraud claim, the plaintiffs could not *reasonably* rely on these statements. If the plaintiffs had wanted specific protections, then they or their counsel should have included express commitments in the transaction documents. *See Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1035 (Del. Ch. 2006); *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 141–42 (Del. Ch. 2003).

The next set of overt misrepresentations related to the number of warrants that the defendants could demand in exchange for extending the Company's credit line under the terms of the 2016 Financing. The plaintiffs claim that the defendants represented that they would provide the Company with up to $3 million more in credit in return for warrants for

---

[17] *See generally* Gillian K. Hadfield & Iva Bozovic, *Scaffolding: Using Formal Contracts to Support Informal Relations in Support of Innovation*, 2016 Wis. L. Rev. 981 (2016) (discussing role of trust as a substitute for contractual enforcement for small and innovative companies); Brad Bernthal, *Investment Accelerators*, 21 Stan. J. L. Bus. & Fin. 139 (2016); Jason M. Gordon & David Orozco, *Trust and Control: The Value Effect of Venture Capital Term Sheet Provisions as Risk Allocation Tools*, 4 Mich. Bus. & Entrepreneurial L. Rev. 195 (2015); Laura Bottazzi et al., *The Importance of Trust for Investment: Evidence from Venture Capital*, 29 R. Fin. Studs. 2283 (2016); Ronald J. Gilson, *Engineering a Venture Capital Market: Lessons from the American Experience*, 55 Stan. L. Rev. 1067 (2003).

another 379,034 shares. In support of this contention, the plaintiffs cite the term sheet for the 2016 Financing, which stated: "For avoidance of doubt, if the LOC is drawn to the full extent . . . and WR Convertible Debt is converted, it is possible that WR's ownership could be as much [as] 38% of the Holding company." Compl. ¶ 64 (internal quotation marks omitted; alteration in original). The plaintiffs also cite Section 1.2 of the Loan Agreement, which gave the defendants the option to increase the credit facility and receive warrants for another 379,034 shares. And they cite a schedule to the warrant certificate, which stated that if the Company drew down all of the original $5 million credit line, plus the optional $3 million extended credit line, then defendants would own only 34% of the Company's fully diluted equity. Compl. ¶¶ 9, 58, 64. The plaintiffs allege that the defendants misled them to believe that the defendants would not receive more than 34% of the Company for a loan package of up to $8 million, when instead the defendants planned to refuse to fund the second tranche of the credit facility unless they received a majority of the equity.

The plaintiffs have not cited a false representation. Instead, they appear to have misinterpreted the agreements. The term sheet gave the defendants an option and capped what the defendants would receive if they exercised it. The term sheet did not say what the defendants would receive if they declined to exercise the option and bargained for different terms. In any event, the Loan Agreement superseded the term sheet. Loan Agreement § 10.1 ("This Agreement and the other Loan Documents constitute the complete agreement between the parties . . . [and] supersede all prior agreements . . . ."). Once the Loan Agreement was in place, the plaintiffs could no longer rely on the term sheet.

41

The Loan Agreement did not cap the amount of equity that the defendants could receive, nor did it give the plaintiffs an option to demand $3 million in additional financing in exchange for a set number of warrants. The option ran the other way. WR Capital could exercise its option for a set number of warrants, or it could decline to exercise its option and ask for other consideration.

Neither of the plaintiffs' theories of overt fraud supports a claim. In the first instance, the plaintiffs pinned their hopes on puffery. In the second, they misunderstood how the financing worked. In neither case were they defrauded.

### 2.     Fraudulent Concealment

The plaintiffs next claim that the defendants fraudulently concealed material information in connection with the Spring 2018 Capital Raise. The plaintiffs contend that the defendants refused to turn over a support agreement detailing side benefits that the defendants sought in the Spring 2018 Capital Raise and information about the negotiations that took place during the Spring 2018 Capital Raise.

This claim fails for multiple reasons. For one, the plaintiffs have not alleged that the defendants fraudulently concealed information. They have alleged that the defendants openly refused to provide it. If the plaintiffs thought they had a right to the information, then they could have sued to enforce it.

For another, the plaintiffs have not alleged how they detrimentally relied on the defendants' failure to provide this information. WR Capital controlled the Company, and it could have engaged in any transaction with or without the support of the plaintiffs. The

complaint does not explain how the fraudulent concealment induced action by the plaintiffs.

Most fundamentally, the Spring 2018 Capital Raise did not lead to a transaction. The complaint does not explain how the plaintiffs were harmed by a transaction that never took place.

### 3. Silence In The Face Of A Duty To Speak

Invoking the third species of fraud, the plaintiffs contend that the defendants remained silent in the face of a duty to speak. In their answering brief, the plaintiffs argue that the defendants failed to disclose "their scheme to take control of [the Company] by (a) shutting out capital sources; (b) controlling the [C]ompany's business affairs; (c) diluting [the] [p]laintiffs' equity through [the 2017 Financing]; (d) undercutting management; and (e) installing Knyal and rewarding him with outsized equity to ensure loyalty." Dkt. 36 at 38–39.

As the basis for the defendants' duty to speak, the plaintiffs cite the duty of disclosure that the defendants' owed as directors and controlling stockholders. The "duty of disclosure is not an independent duty, but derives from the duties of care and loyalty." *Pfeffer v. Redstone*, 965 A.2d 676, 684 (Del. 2009) (internal quotation marks omitted). The duty of disclosure arises because of "the application in a specific context of the board's fiduciary duties . . . ." *Malpiede v. Townson*, 780 A.2d 1075, 1086 (Del. 2001). A claim for breach of the duty of disclosure is thus a claim for breach of fiduciary duty, which the plaintiffs transferred when they sold their shares. And a claim for breach of fiduciary duty fails when it asks the defendants to engage in self-flagellation. *See, e.g.*, *Loudon v. Archer-*

*Daniels-Midland Co.*, 700 A.2d 135, 143 (Del. 1997). As framed by the plaintiffs, the disclosures they seek would have required self-flagellation.

## C.     The Unjust Enrichment Claim

The last claim is Count VII, where the plaintiffs contend that the defendants unjustly enriched themselves through the 2017 Financing. On the facts of this case, the plaintiffs cannot maintain a claim for unjust enrichment.

The elements of unjust enrichment are deceptively simple to state: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law. *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010). These straightforward elements mask a more flexible and free-flowing doctrine.

Unjust enrichment is "a very broad and flexible equitable doctrine that has as its basis the principle that it is contrary to equity and good conscience for a defendant to retain a benefit that has come to him at the expense of the plaintiff." *Cobalt Multifamily Inv'rs I, LLC v. Shapiro*, 9 F. Supp. 3d 399, 411 (S.D.N.Y. 2014) (internal quotation marks omitted)). It "seems to be the tool that allowed law to move from the old medieval world of property and things to the modern world of contracts and by intangibles." Dan B. Dobbs, *Law of Remedies: Damages—Equity—Restitution* 375 (2d ed. 1993). "[T]he gist of this kind of action is, that the defendant, upon the circumstances of the case, is obliged by the ties of natural justice and equity to refund the money." *Restatement (Third) of Restitution and Unjust Enrichment* § 1 cmt. b, Westlaw (database updated June 2019). Claims for unjust enrichment do "not fit comfortably into either the category of contract or that of

44

tort." E. Allen Farnsworth, *Farnsworth on Contracts* § 2.24, at 2-150 to -151 (4th ed. 2019). "[U]njust enrichment can be characterized as a 'legal principle' incorporating a broad ideal of justice, from which courts can deduce solutions to particular restitution problems." Emily Sherwin, *Restitution and Equity: An Analysis of the Principle of Unjust Enrichment*, 79 Tex. L. Rev. 2083, 2084 (2001).

The difficulty with unjust enrichment is a corollary to its strength. Because it is flexible and free-flowing, unjust enrichment can encroach on other areas of the law and upset settled frameworks. That is the problem with the claim here. According to the plaintiffs, the defendants unjustly enriched themselves to the plaintiffs' detriment "when, without justification, [the defendants] shut out new investors and then leveraged [the Company]'s need for capital to demand millions of new warrants for extending the agreed-upon credit line." Dkt. 36 at 41. That is the same theory that the plaintiffs seek to litigate through their claims for breach of fiduciary duty and breach of contract.

When an unjust enrichment theory duplicates a breach of fiduciary duty claim, it is typically dismissed in favor of the breach of fiduciary duty claim so that the more settled doctrine can govern. *See Calma ex rel. Citrix Sys., Inc. v. Templeton*, 114 A.3d 563, 591–92 (Del. Ch. 2015); *Monroe Cty. Empls.' Ret. Sys. v. Carlson*, 2010 WL 2376890, at *1–2 (Del. Ch. June 7, 2010). The same is true for an unjust enrichment claim that duplicates a claim for breach of contract. *See PharmaThene, Inc. v. SIGA Techs., Inc.*, 2011 WL 4390726, at *27 (Del. Ch. Sept. 22, 2011), *aff'd in part, rev'd in part on other grounds*, 67 A.3d 330 (Del. 2013); *MCG Capital Corp. v. Maginn*, 2010 WL 1782271, at *24 (Del. Ch.

May 5, 2010). In both situations, permitting the theory to proceed would upset the settled outcomes generated by the established legal frameworks. Those principles apply here.

On the facts of this case, the unjust enrichment theory also depends on the plaintiffs' status as stockholders. In essence, the plaintiffs contend that the Company was impoverished when it issued more warrants in the 2017 Financing than it should have been required to issue. Because the Company was harmed, and because any remedy would go to the Company, the unjust enrichment claim is derivative. Having sold their shares, they can no longer assert that claim.

Just as a breach of fiduciary duty claim that is derivative can be reframed as direct, so too can the plaintiffs cast their unjust enrichment claim as direct. Recast in this light, the plaintiffs argue that the voting power of their shares was diluted when the Company issued more warrants in the 2017 Financing than it should have been required to issue. The reframing does not help the plaintiffs, because the detriment still affected their shares. Just as they gave up their ability to assert a direct claim for dilution when they sold their shares, they likewise gave up a parallel claim for unjust enrichment based on harm to their shares.

For each of these reasons, Count VII is dismissed.

### III. CONCLUSION

The complaint originally contained eight counts. The plaintiffs failed to state a claim for fraud in either Count IV or V. They also failed to state a claim for unjust enrichment in Count VII. The plaintiffs released the claims asserted in Counts II and III and dismissed the defendant who was the subject of their claims. By selling their shares, the plaintiffs

46

gave up their rights to assert their other claims. The defendants' motion to dismiss is granted.